# DOE ET AL. *v.* BOLTON, ATTORNEY GENERAL OF GEORGIA, ET AL.

No. 70–40.  Argued December 13, 1971—Reargued October 11, 1972—Decided January 22, 1973

180

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and DOUGLAS, BRENNAN, STEWART, MARSHALL, and POWELL, JJ., joined. BURGER, C. J., *post*, p. 207, and DOUGLAS, J., *post*, p. 209, filed concurring opinions. WHITE, J., filed a dissenting opinion, in which REHNQUIST, J., joined, *post*, p. 221. REHNQUIST, J., filed a dissenting opinion, *post*, p. 223.

*Margie Pitts Hames* reargued the cause for appellants. With her on the briefs were *Reber F. Boult, Jr., Charles Morgan, Jr., Elizabeth Roediger Rindskopf,* and *Tobiane Schwartz.*

*Dorothy T. Beasley* reargued the cause for appellees. With her on the brief were *Arthur K. Bolton,* Attorney General of Georgia, *Harold N. Hill, Jr.,* Executive Assistant Attorney General, *Courtney Wilder Stanton,* Assistant Attorney General, *Joel Feldman, Henry L. Bowden,* and *Ralph H. Witt.**

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

In this appeal, the criminal abortion statutes recently enacted in Georgia are challenged on constitutional grounds. The statutes are §§ 26–1201 through 26–1203 of the State's Criminal Code, formulated by Georgia Laws, 1968 Session, pp. 1249, 1277–1280. In *Roe v. Wade, ante,* p. 113, we today have struck down, as constitutionally defective, the Texas criminal abortion statutes that are representative of provisions long in effect

---

*Briefs of *amici curiae* were filed by *Roy Lucas* for the American College of Obstetricians and Gynecologists et al.; by *Dennis J. Horan, Jerome A. Frazel, Jr., Thomas M. Crisham,* and *Delores V. Horan* for Certain Physicians, Professors and Fellows of the American College of Obstetrics and Gynecology; by *Harriet F. Pilpel, Nancy F. Wechsler,* and *Frederic S. Nathan* for Planned Parenthood Federation of America, Inc., et al.; by *Alan F. Charles* for the National Legal Program on Health Problems of the Poor et al.; by *Marttie L. Thompson* for State Communities Aid Assn.; by *Alfred L. Scanlan, Martin J. Flynn,* and *Robert M. Byrn* for the National Right to Life Committee; by *Helen L. Buttenwieser* for the American Ethical Union et al.; by *Norma G. Zarky* for the American Association of University Women et al.; by *Nancy Stearns* for New Women Lawyers et al.; by the California Committee to Legalize Abortion et al.; by *Robert E. Dunne* for Robert L. Sassone; and by *Ferdinand Buckley pro se.*

in a majority of our States. The Georgia legislation, however, is different and merits separate consideration.

## I

The statutes in question are reproduced as Appendix A, *post,* p. 202.[1] As the appellants acknowledge,[2] the 1968 statutes are patterned upon the American Law Institute's Model Penal Code, § 230.3 (Proposed Official Draft, 1962), reproduced as Appendix B, *post,* p. 205. The ALI proposal has served as the model for recent legislation in approximately one-fourth of our States.[3] The new Georgia provisions replaced statutory law that had been in effect for more than 90 years. Georgia Laws 1876, No. 130, § 2, at 113.[4] The predecessor statute paralleled

---

[1] The portions italicized in Appendix A are those held unconstitutional by the District Court.

[2] Brief for Appellants 25 n. 5; Tr. of Oral Arg. 9.

[3] See *Roe* v. *Wade, ante,* p. 113, at 140 n. 37.

[4] The pertinent provisions of the 1876 statute were:

"Section I. *Be it enacted, etc.,* That from and after the passage of this Act, the wilful killing of an unborn child, so far developed as to be ordinarily called 'quick,' by any injury to the mother of such child, which would be murder if it resulted in the death of such mother, shall be guilty of a felony, and punishable by death or imprisonment for life, as the jury trying the case may recommend.

"Sec. II. *Be it further enacted,* That every person who shall administer to any woman pregnant with a child, any medicine, drug, or substance whatever, or shall use or employ any instrument or other means, with intent thereby to destroy such child, unless the same shall have been necessary to preserve the life of such mother, or shall have been advised by two physicians to be necessary for such purpose, shall, in case the death of such child or mother be thereby produced, be declared guilty of an assault with intent to murder.

"Sec. III. *Be it further enacted,* That any person who shall wilfully administer to any pregnant woman any medicine, drug or substance, or anything whatever, or shall employ any instrument or means whatever, with intent thereby to procure the miscarriage or abortion of any such woman, unless the same shall have been necessary to preserve the life of such woman, or shall have been advised

the Texas legislation considered in *Roe* v. *Wade, supra,* and made all abortions criminal except those necessary "to preserve the life" of the pregnant woman. The new statutes have not been tested on constitutional grounds in the Georgia state courts.

Section 26–1201, with a referenced exception, makes abortion a crime, and § 26–1203 provides that a person convicted of that crime shall be punished by imprisonment for not less than one nor more than 10 years. Section 26–1202 (a) states the exception and removes from § 1201's definition of criminal abortion, and thus makes noncriminal, an abortion "performed by a physician duly licensed" in Georgia when, "based upon his best clinical judgment . . . an abortion is necessary because:

"(1) A continuation of the pregnancy would endanger the life of the pregnant woman or would seriously and permanently injure her health; or

"(2) The fetus would very likely be born with a grave, permanent, and irremediable mental or physical defect; or

"(3) The pregnancy resulted from forcible or statutory rape." [5]

Section 26–1202 also requires, by numbered subdivisions of its subsection (b), that, for an abortion to be author-

---

by two physicians to be necessary for that purpose, shall, upon conviction, be punished as prescribed in section 4310 of the Revised Code of Georgia."

It should be noted that the second section, in contrast to the first, made no specific reference to quickening. The section was construed, however, to possess this line of demarcation. *Taylor* v. *State,* 105 Ga. 846, 33 S. E. 190 (1899).

[5] In contrast with the ALI model, the Georgia statute makes no specific reference to pregnancy resulting from incest. We were assured by the State at reargument that this was because the statute's reference to "rape" was intended to include incest. Tr. of Oral Rearg. 32.

ized or performed as a noncriminal procedure, additional conditions must be fulfilled. These are (1) and (2) residence of the woman in Georgia; (3) reduction to writing of the performing physician's medical judgment that an abortion is justified for one or more of the reasons specified by § 26–1202 (a), with written concurrence in that judgment by at least two other Georgia-licensed physicians, based upon their separate personal medical examinations of the woman; (4) performance of the abortion in a hospital licensed by the State Board of Health and also accredited by the Joint Commission on Accreditation of Hospitals; (5) advance approval by an abortion committee of not less than three members of the hospital's staff; (6) certifications in a rape situation; and (7), (8), and (9) maintenance and confidentiality of records. There is a provision (subsection (c)) for judicial determination of the legality of a proposed abortion on petition of the judicial circuit law officer or of a close relative, as therein defined, of the unborn child, and for expeditious hearing of that petition. There is also a provision (subsection (e)) giving a hospital the right not to admit an abortion patient and giving any physician and any hospital employee or staff member the right, on moral or religious grounds, not to participate in the procedure.

## II

On April 16, 1970, Mary Doe,[6] 23 other individuals (nine described as Georgia-licensed physicians, seven as nurses registered in the State, five as clergymen, and two as social workers), and two nonprofit Georgia corporations that advocate abortion reform instituted this federal action in the Northern District of Georgia against the State's attorney general, the district attorney of

---

[6] Appellants by their complaint, App. 7, allege that the name is a pseudonym.

Fulton County, and the chief of police of the city of Atlanta. The plaintiffs sought a declaratory judgment that the Georgia abortion statutes were unconstitutional in their entirety. They also sought injunctive relief restraining the defendants and their successors from enforcing the statutes.

Mary Doe alleged:

(1) She was a 22-year-old Georgia citizen, married, and nine weeks pregnant. She had three living children. The two older ones had been placed in a foster home because of Doe's poverty and inability to care for them. The youngest, born July 19, 1969, had been placed for adoption. Her husband had recently abandoned her and she was forced to live with her indigent parents and their eight children. She and her husband, however, had become reconciled. He was a construction worker employed only sporadically. She had been a mental patient at the State Hospital. She had been advised that an abortion could be performed on her with less danger to her health than if she gave birth to the child she was carrying. She would be unable to care for or support the new child.

(2) On March 25, 1970, she applied to the Abortion Committee of Grady Memorial Hospital, Atlanta, for a therapeutic abortion under § 26–1202. Her application was denied 16 days later, on April 10, when she was eight weeks pregnant, on the ground that her situation was not one described in § 26–1202 (a).[7]

(3) Because her application was denied, she was forced either to relinquish "her right to decide when and how many children she will bear" or to seek an abortion that was illegal under the Georgia statutes. This invaded her

---

[7] In answers to interrogatories, Doe stated that her application for an abortion was approved at Georgia Baptist Hospital on May 5, 1970, but that she was not approved as a charity patient there and had no money to pay for an abortion. App. 64.

rights of privacy and liberty in matters related to family, marriage, and sex, and deprived her of the right to choose whether to bear children. This was a violation of rights guaranteed her by the First, Fourth, Fifth, Ninth, and Fourteenth Amendments. The statutes also denied her equal protection and procedural due process and, because they were unconstitutionally vague, deterred hospitals and doctors from performing abortions. She sued "on her own behalf and on behalf of all others similarly situated."

The other plaintiffs alleged that the Georgia statutes "chilled and deterred" them from practicing their respective professions and deprived them of rights guaranteed by the First, Fourth, and Fourteenth Amendments. These plaintiffs also purported to sue on their own behalf and on behalf of others similarly situated.

A three-judge district court was convened. An offer of proof as to Doe's identity was made, but the court deemed it unnecessary to receive that proof. The case was then tried on the pleadings and interrogatories.

The District Court, *per curiam*, 319 F. Supp. 1048 (ND Ga. 1970), held that all the plaintiffs had standing but that only Doe presented a justiciable controversy. On the merits, the court concluded that the limitation in the Georgia statute of the "number of reasons for which an abortion may be sought," *id.*, at 1056, improperly restricted Doe's rights of privacy articulated in *Griswold* v. *Connecticut*, 381 U. S. 479 (1965), and of "personal liberty," both of which it thought "broad enough to include the decision to abort a pregnancy," 319 F. Supp., at 1055. As a consequence, the court held invalid those portions of §§ 26–1202 (a) and (b)(3) limiting legal abortions to the three situations specified; § 26–1202 (b)(6) relating to certifications in a rape situation; and § 26–1202 (c) authorizing a court test. Declaratory relief was granted accordingly. The court, however, held

that Georgia's interest in protection of health, and the existence of a *"potential* of independent human existence" (emphasis in original), *id.,* at 1055, justified state regulation of "the manner of performance as well as the quality of the final decision to abort," *id.,* at 1056, and it refused to strike down the other provisions of the statutes. It denied the request for an injunction, *id.,* at 1057.

Claiming that they were entitled to an injunction and to broader relief, the plaintiffs took a direct appeal pursuant to 28 U. S. C. § 1253. We postponed decision on jurisdiction to the hearing on the merits. 402 U. S. 941 (1971). The defendants also purported to appeal, pursuant to § 1253, but their appeal was dismissed for want of jurisdiction. 402 U. S. 936 (1971). We are advised by the appellees, Brief 42, that an alternative appeal on their part is pending in the United States Court of Appeals for the Fifth Circuit. The extent, therefore, to which the District Court decision was adverse to the defendants, that is, the extent to which portions of the Georgia statutes were held to be unconstitutional, technically is not now before us.[8] *Swarb* v. *Lennox,* 405 U. S. 191, 201 (1972).

### III

Our decision in *Roe* v. *Wade, ante,* p. 113, establishes (1) that, despite her pseudonym, we may accept as true, for this case, Mary Doe's existence and her pregnant state on April 16, 1970; (2) that the constitutional issue is substantial; (3) that the interim termination of Doe's and all other Georgia pregnancies in existence in 1970 has not rendered the case moot; and (4) that Doe presents a justiciable controversy and has standing to maintain the action.

---

[8] What we decide today obviously has implications for the issues raised in the defendants' appeal pending in the Fifth Circuit.

Inasmuch as Doe and her class are recognized, the question whether the other appellants—physicians, nurses, clergymen, social workers, and corporations— present a justiciable controversy and have standing is perhaps a matter of no great consequence. We conclude, however, that the physician-appellants, who are Georgia-licensed doctors consulted by pregnant women, also present a justiciable controversy and do have standing despite the fact that the record does not disclose that any one of them has been prosecuted, or threatened with prosecution, for violation of the State's abortion statutes. The physician is the one against whom these criminal statutes directly operate in the event he procures an abortion that does not meet the statutory exceptions and conditions. The physician-appellants, therefore, assert a sufficiently direct threat of personal detriment. They should not be required to await and undergo a criminal prosecution as the sole means of seeking relief. *Crossen* v. *Breckenridge,* 446 F. 2d 833, 839–840 (CA6 1971); *Poe* v. *Menghini,* 339 F. Supp. 986, 990–991 (Kan. 1972).

In holding that the physicians, while theoretically possessed of standing, did not present a justiciable controversy, the District Court seems to have relied primarily on *Poe* v. *Ullman,* 367 U. S. 497 (1961). There, a sharply divided Court dismissed an appeal from a state court on the ground that it presented no real controversy justifying the adjudication of a constitutional issue. But the challenged Connecticut statute, deemed to prohibit the giving of medical advice on the use of contraceptives, had been enacted in 1879, and, apparently with a single exception, no one had ever been prosecuted under it. Georgia's statute, in contrast, is recent and not moribund. Furthermore, it is the successor to another

Georgia abortion statute under which, we are told,[9] physicians were prosecuted. The present case, therefore, is closer to *Epperson* v. *Arkansas,* 393 U. S. 97 (1968), where the Court recognized the right of a school teacher, though not yet charged criminally, to challenge her State's anti-evolution statute. See also *Griswold* v. *Connecticut,* 381 U. S., at 481.

The parallel claims of the nurse, clergy, social worker, and corporation-appellants are another step removed and as to them, the Georgia statutes operate less directly. Not being licensed physicians, the nurses and the others are in no position to render medical advice. They would be reached by the abortion statutes only in their capacity as accessories or as counselor-conspirators. We conclude that we need not pass upon the status of these additional appellants in this suit, for the issues are sufficiently and adequately presented by Doe and the physician-appellants, and nothing is gained or lost by the presence or absence of the nurses, the clergymen, the social workers, and the corporations. See *Roe* v. *Wade, ante,* at 127.

## IV

The appellants attack on several grounds those portions of the Georgia abortion statutes that remain after the District Court decision: undue restriction of a right to personal and marital privacy; vagueness; deprivation of substantive and procedural due process; improper restriction to Georgia residents; and denial of equal protection.

A. *Roe* v. *Wade, supra,* sets forth our conclusion that a pregnant woman does not have an absolute constitutional right to an abortion on her demand. What is said there is applicable here and need not be repeated.

---

[9] Tr. of Oral Arg. 21–22.

B. The appellants go on to argue, however, that the present Georgia statutes must be viewed historically, that is, from the fact that prior to the 1968 Act an abortion in Georgia was not criminal if performed to "preserve the life" of the mother. It is suggested that the present statute, as well, has this emphasis on the mother's rights, not on those of the fetus. Appellants contend that it is thus clear that Georgia has given little, and certainly not first, consideration to the unborn child. Yet, it is the unborn child's rights that Georgia asserts in justification of the statute. Appellants assert that this justification cannot be advanced at this late date.

Appellants then argue that the statutes do not adequately protect the woman's right. This is so because it would be physically and emotionally damaging to Doe to bring a child into her poor, "fatherless"[10] family, and because advances in medicine and medical techniques have made it safer for a woman to have a medically induced abortion than for her to bear a child. Thus, "a statute that requires a woman to carry an unwanted pregnancy to term infringes not only on a fundamental right of privacy but on the right to life itself." Brief 27.

The appellants recognize that a century ago medical knowledge was not so advanced as it is today, that the techniques of antisepsis were not known, and that any abortion procedure was dangerous for the woman. To restrict the legality of the abortion to the situation where it was deemed necessary, in medical judgment, for the preservation of the woman's life was only a natural conclusion in the exercise of the legislative judgment of that time. A State is not to be reproached, however, for a past judgmental determination made in the light of then-existing medical knowledge. It is perhaps unfair to argue, as the appellants do, that because the early focus

---

[10] Brief for Appellants 25.

was on the preservation of the woman's life, the State's present professed interest in the protection of embryonic and fetal life is to be downgraded. That argument denies the State the right to readjust its views and emphases in the light of the advanced knowledge and techniques of the day.

C. Appellants argue that § 26–1202 (a) of the Georgia statutes, as it has been left by the District Court's decision, is unconstitutionally vague. This argument centers on the proposition that, with the District Court's having struck down the statutorily specified reasons, it still remains a crime for a physician to perform an abortion except when, as § 26–1202 (a) reads, it is "based upon his best clinical judgment that an abortion is necessary." The appellants contend that the word "necessary" does not warn the physician of what conduct is proscribed; that the statute is wholly without objective standards and is subject to diverse interpretation; and that doctors will choose to err on the side of caution and will be arbitrary.

The net result of the District Court's decision is that the abortion determination, so far as the physician is concerned, is made in the exercise of his professional, that is, his "best clinical," judgment in the light of *all* the attendant circumstances. He is not now restricted to the three situations originally specified. Instead, he may range farther afield wherever his medical judgment, properly and professionally exercised, so dictates and directs him.

The vagueness argument is set at rest by the decision in *United States* v. *Vuitch,* 402 U. S. 62, 71–72 (1971), where the issue was raised with respect to a District of Columbia statute making abortions criminal "unless the same were done as necessary for the preservation of the mother's life or health and under the direction of a competent licensed practitioner of medicine." That statute has been construed to bear upon psychological as

well as physical well-being. This being so, the Court concluded that the term "health" presented no problem of vagueness. "Indeed, whether a particular operation is necessary for a patient's physical or mental health is a judgment that physicians are obviously called upon to make routinely whenever surgery is considered." *Id.*, at 72. This conclusion is equally applicable here. Whether, in the words of the Georgia statute, "an abortion is necessary" is a professional judgment that the Georgia physician will be called upon to make routinely.

We agree with the District Court, 319 F. Supp., at 1058, that the medical judgment may be exercised in the light of all factors—physical, emotional, psychological, familial, and the woman's age—relevant to the well-being of the patient. All these factors may relate to health. This allows the attending physician the room he needs to make his best medical judgment. And it is room that operates for the benefit, not the disadvantage, of the pregnant woman.

D. The appellants next argue that the District Court should have declared unconstitutional three procedural demands of the Georgia statute: (1) that the abortion be performed in a hospital accredited by the Joint Commission on Accreditation of Hospitals:[11] (2) that the procedure be approved by the hospital staff abortion committee; and (3) that the performing physician's judgment be confirmed by the independent examinations of the patient by two other licensed physicians. The appellants attack these provisions not only on the ground that they unduly restrict the woman's right of privacy, but also on procedural due process and equal protection grounds. The physician-appellants also argue that, by subjecting a doctor's individual medical judgment to

[11] We were advised at reargument, Tr. of Oral Rearg. 10, that only 54 of Georgia's 159 counties have a JCAH-accredited hospital.

committee approval and to confirming consultations, the statute impermissibly restricts the physician's right to practice his profession and deprives him of due process.

1. *JCAH accreditation.* The Joint Commission on Accreditation of Hospitals is an organization without governmental sponsorship or overtones. No question whatever is raised concerning the integrity of the organization or the high purpose of the accreditation process.[12] That process, however, has to do with hospital standards generally and has no present particularized concern with abortion as a medical or surgical procedure.[13]  In Georgia, there is no restriction on the performance of nonabortion surgery in a hospital not yet accredited by the JCAH so long as other requirements imposed by the State, such as licensing of the hospital and of the operating surgeon, are met.  See Georgia Code §§ 88–1901 (a)

---

[12] Since its founding, JCAH has pursued the "elusive goal" of defining the "optimal setting" for "quality of service in hospitals." JCAH, Accreditation Manual for Hospitals, Foreword (Dec. 1970). The Manual's Introduction states the organization's purpose to establish standards and conduct accreditation programs that will afford quality medical care "to give patients the optimal benefits that medical science has to offer." This ambitious and admirable goal is illustrated by JCAH's decision in 1966 "[t]o raise and strengthen the standards from their present level of minimum essential to the level of optimum achievable . . . ." Some of these "optimum achievable" standards required are: disclosure of hospital ownership and control; a dietetic service and written dietetic policies; a written disaster plan for mass emergencies; a nuclear medical services program; facilities for hematology, chemistry, microbiology, clinical microscopy, and sero-immunology; a professional library and document delivery service; a radiology program; a social services plan administered by a qualified social worker; and a special care unit.

[13] "The Joint Commission neither advocates nor opposes any particular position with respect to elective abortions." Letter dated July 9, 1971, from John I. Brewer, M. D., Commissioner, JCAH, to the Rockefeller Foundation. Brief for *amici curiae,* American College of Obstetricians and Gynecologists et al., p. A–3.

and 88–1905 (1971) and 84–907 (Supp. 1971). Furthermore, accreditation by the Commission is not granted until a hospital has been in operation at least one year. The Model Penal Code, § 230.3, Appendix B hereto, contains no requirement for JCAH accreditation. And the Uniform Abortion Act (Final Draft, Aug. 1971),[14] approved by the American Bar Association in February 1972, contains no JCAH-accredited hospital specification.[15] Some courts have held that a JCAH-accreditation requirement is an overbroad infringement of fundamental rights because it does not relate to the particular medical problems and dangers of the abortion operation. *E. g., Poe* v. *Menghini,* 339 F. Supp., at 993–994.

We hold that the JCAH-accreditation requirement does not withstand constitutional scrutiny in the present context. It is a requirement that simply is not "based on differences that are reasonably related to the purposes of the Act in which it is found." *Morey* v. *Doud,* 354 U. S. 457, 465 (1957).

This is not to say that Georgia may not or should not, from and after the end of the first trimester, adopt

---

[14] See *Roe* v. *Wade, ante,* at 146–147, n. 40.

[15] Some state statutes do not have the JCAH-accreditation requirement. Alaska Stat. § 11.15.060 (1970); Hawaii Rev. Stat. § 453–16 (Supp. 1971); N. Y. Penal Code § 125.05, subd. 3 (Supp. 1972–1973). Washington has the requirement but couples it with the alternative of "a medical facility approved . . . by the state board of health." Wash. Rev. Code § 9.02.070 (Supp. 1972). Florida's new statute has a similar provision. Law of Apr. 13, 1972, c. 72–196, § 1 (2). Others contain the specification. Ark. Stat. Ann. §§ 41–303 to 41–310 (Supp. 1971); Calif. Health & Safety Code §§ 25950–25955.5 (Supp. 1972); Colo. Rev. Stat. Ann. §§ 40–2–50 to 40–2–53 (Cum. Supp. 1967); Kan. Stat. Ann. § 21–3407 (Supp. 1971); Md. Ann. Code, Art. 43, §§ 137–139 (1971). Cf. Del. Code Ann., Tit. 24, §§ 1790–1793 (Supp. 1972), specifying "a nationally recognized medical or hospital accreditation authority," § 1790 (a).

standards for licensing all facilities where abortions may be performed so long as those standards are legitimately related to the objective the State seeks to accomplish. The appellants contend that such a relationship would be lacking even in a lesser requirement that an abortion be performed in a licensed hospital, as opposed to a facility, such as a clinic, that may be required by the State to possess all the staffing and services necessary to perform an abortion safely (including those adequate to handle serious complications or other emergency, or arrangements with a nearby hospital to provide such services). Appellants and various *amici* have presented us with a mass of data purporting to demonstrate that some facilities other than hospitals are entirely adequate to perform abortions if they possess these qualifications. The State, on the other hand, has not presented persuasive data to show that only hospitals meet its acknowledged interest in insuring the quality of the operation and the full protection of the patient. We feel compelled to agree with appellants that the State must show more than it has in order to prove that only the full resources of a licensed hospital, rather than those of some other appropriately licensed institution, satisfy these health interests. We hold that the hospital requirement of the Georgia law, because it fails to exclude the first trimester of pregnancy, see *Roe* v. *Wade, ante,* at 163, is also invalid. In so holding we naturally express no opinion . on the medical judgment involved in any particular case, that is, whether the patient's situation is such that an abortion should be performed in a hospital, rather than in some other facility.

2. *Committee approval.* The second aspect of the appellants' procedural attack relates to the hospital abortion committee and to the pregnant woman's asserted

lack of access to that committee. Relying primarily on *Goldberg* v. *Kelly,* 397 U. S. 254 (1970), concerning the termination of welfare benefits, and *Wisconsin* v. *Constantineau,* 400 U. S. 433 (1971), concerning the posting of an alcoholic's name, Doe first argues that she was denied due process because she could not make a presentation to the committee. It is not clear from the record, however, whether Doe's own consulting physician was or was not a member of the committee or did or did not present her case, or, indeed, whether she herself was or was not there. We see nothing in the Georgia statute that explicitly denies access to the committee by or on behalf of the woman. If the access point alone were involved, we would not be persuaded to strike down the committee provision on the unsupported assumption that access is not provided.

Appellants attack the discretion the statute leaves to the committee. The most concrete argument they advance is their suggestion that it is still a badge of infamy "in many minds" to bear an illegitimate child, and that the Georgia system enables the committee members' personal views as to extramarital sex relations, and punishment therefor, to govern their decisions. This approach obviously is one founded on suspicion and one that discloses a lack of confidence in the integrity of physicians. To say that physicians will be guided in their hospital committee decisions by their predilections on extramarital sex unduly narrows the issue to pregnancy outside marriage. (Doe's own situation did not involve extramarital sex and its product.) The appellants' suggestion is necessarily somewhat degrading to the conscientious physician, particularly the obstetrician, whose professional activity is concerned with the physical and mental welfare, the woes, the emotions, and the concern of his female patients. He, perhaps more than anyone else, is knowledgeable in this area of patient care, and he is aware of human frailty,

so-called "error," and needs. The good physician—despite the presence of rascals in the medical profession, as in all others, we trust that most physicians are "good"—will have sympathy and understanding for the pregnant patient that probably are not exceeded by those who participate in other areas of professional counseling.

It is perhaps worth noting that the abortion committee has a function of its own. It is a committee of the hospital and it is composed of members of the institution's medical staff. The membership usually is a changing one. In this way, its work burden is shared and is more readily accepted. The committee's function is protective. It enables the hospital appropriately to be advised that its posture and activities are in accord with legal requirements. It is to be remembered that the hospital is an entity and that it, too, has legal rights and legal obligations.

Saying all this, however, does not settle the issue of the constitutional propriety of the committee requirement. Viewing the Georgia statute as a whole, we see no constitutionally justifiable pertinence in the structure for the advance approval by the abortion committee. With regard to the protection of potential life, the medical judgment is already completed prior to the committee stage, and review by a committee once removed from diagnosis is basically redundant. We are not cited to any other surgical procedure made subject to committee approval as a matter of state criminal law. The woman's right to receive medical care in accordance with her licensed physician's best judgment and the physician's right to administer it are substantially limited by this statutorily imposed overview. And the hospital itself is otherwise fully protected. Under § 26–1202 (e), the hospital is free not to admit a patient for an abortion. It is even free not to have an abortion committee. Further, a physician or any other employee has the right to refrain,

for moral or religious reasons, from participating in the abortion procedure. These provisions obviously are in the statute in order to afford appropriate protection to the individual and to the denominational hospital. Section 26–1202 (e) affords adequate protection to the hospital, and little more is provided by the committee prescribed by § 26–1202 (b)(5).

We conclude that the interposition of the hospital abortion committee is unduly restrictive of the patient's rights and needs that, at this point, have already been medically delineated and substantiated by her personal physician. To ask more serves neither the hospital nor the State.

3. *Two-doctor concurrence.* The third aspect of the appellants' attack centers on the "time and availability of adequate medical facilities and personnel." It is said that the system imposes substantial and irrational roadblocks and "is patently unsuited" to prompt determination of the abortion decision. Time, of course, is critical in abortion. Risks during the first trimester of pregnancy are admittedly lower than during later months.

The appellants purport to show by a local study [16] of Grady Memorial Hospital (serving indigent residents in Fulton and DeKalb Counties) that the "mechanics of the system itself forced . . . discontinuance of the abortion process" because the median time for the workup was 15 days. The same study shows, however, that 27% of the candidates for abortion were already 13 or more weeks pregnant at the time of application, that is, they were at the end of or beyond the first trimester when they made their applications. It is too much to say, as appellants do, that these particular persons "were victims of a system over which they [had] no control." If higher risk was incurred because of abortions in the

---

[16] L. Baker & M. Freeman, Abortion Surveillance at Grady Memorial Hospital Center for Disease Control (June and July 1971) (U. S. Dept. of HEW, Public Health Service).

second rather than the first trimester, much of that risk was due to delay in application, and not to the alleged cumbersomeness of the system. We note, in passing, that appellant Doe had no delay problem herself; the decision in her case was made well within the first trimester.

It should be manifest that our rejection of the accredited-hospital requirement and, more important, of the abortion committee's advance approval eliminates the major grounds of the attack based on the system's delay and the lack of facilities. There remains, however, the required confirmation by two Georgia-licensed physicians in addition to the recommendation of the pregnant woman's own consultant (making under the statute, a total of six physicians involved, including the three on the hospital's abortion committee). We conclude that this provision, too, must fall.

The statute's emphasis, as has been repetitively noted, is on the attending physician's "best clinical judgment that an abortion is necessary." That should be sufficient. The reasons for the presence of the confirmation step in the statute are perhaps apparent, but they are insufficient to withstand constitutional challenge. Again, no other voluntary medical or surgical procedure for which Georgia requires confirmation by two other physicians has been cited to us. If a physician is licensed by the State, he is recognized by the State as capable of exercising acceptable clinical judgment. If he fails in this, professional censure and deprivation of his license are available remedies. Required acquiescence by co-practitioners has no rational connection with a patient's needs and unduly infringes on the physician's right to practice. The attending physician will know when a consultation is advisable—the doubtful situation, the need for assurance when the medical decision is a delicate one, and the like. Physicians have followed this routine historically and

know its usefulness and benefit for all concerned. It is still true today that "[r]eliance must be placed upon the assurance given by his license, issued by an authority competent to judge in that respect, that he [the physician] possesses the requisite qualifications." *Dent* v. *West Virginia,* 129 U. S. 114, 122–123 (1889). See *United States* v. *Vuitch,* 402 U. S., at 71.

E. The appellants attack the residency requirement of the Georgia law, §§ 26–1202 (b)(1) and (b)(2), as violative of the right to travel stressed in *Shapiro* v. *Thompson,* 394 U. S. 618, 629–631 (1969), and other cases. A requirement of this kind, of course, could be deemed to have some relationship to the availability of post-procedure medical care for the aborted patient.

Nevertheless, we do not uphold the constitutionality of the residence requirement. It is not based on any policy of preserving state-supported facilities for Georgia residents, for the bar also applies to private hospitals and to privately retained physicians. There is no intimation, either, that Georgia facilities are utilized to capacity in caring for Georgia residents. Just as the Privileges and Immunities Clause, Const. Art. IV, § 2, protects persons who enter other States to ply their trade, *Ward* v. *Maryland,* 12 Wall. 418, 430 (1871); *Blake* v. *McClung,* 172 U. S. 239, 248–256 (1898), so must it protect persons who enter Georgia seeking the medical services that are available there. See *Toomer* v. *Witsell,* 334 U. S. 385, 396–397 (1948). A contrary holding would mean that a State could limit to its own residents the general medical care available within its borders. This we could not approve.

F. The last argument on this phase of the case is one that often is made, namely, that the Georgia system is violative of equal protection because it discriminates against the poor. The appellants do not urge that abortions

should be performed by persons other than licensed physicians, so we have no argument that because the wealthy can better afford physicians, the poor should have non-physicians made available to them. The appellants acknowledged that the procedures are "nondiscriminatory in . . . express terms" but they suggest that they have produced invidious discriminations. The District Court rejected this approach out of hand. 319 F. Supp., at 1056. It rests primarily on the accreditation and approval and confirmation requirements, discussed above, and on the assertion that most of Georgia's counties have no accredited hospital. We have set aside the accreditation, approval, and confirmation requirements, however, and with that, the discrimination argument collapses in all significant aspects.

## V

The appellants complain, finally, of the District Court's denial of injunctive relief. A like claim was made in *Roe* v. *Wade, ante,* p. 113. We declined decision there insofar as injunctive relief was concerned, and we decline it here. We assume that Georgia's prosecutorial authorities will give full recognition to the judgment of this Court.

In summary, we hold that the JCAH-accredited hospital provision and the requirements as to approval by the hospital abortion committee, as to confirmation by two independent physicians, and as to residence in Georgia are all violative of the Fourteenth Amendment. Specifically, the following portions of § 26–1202 (b), remaining after the District Court's judgment, are invalid:

(1) Subsections (1) and (2).

(2) That portion of Subsection (3) following the words "[s]uch physician's judgment is reduced to writing."

(3) Subsections (4) and (5).

The judgment of the District Court is modified accordingly and, as so modified, is affirmed. Costs are allowed to the appellants.

## APPENDIX A TO OPINION OF THE COURT

### Criminal Code of Georgia
(The italicized portions are those held unconstitutional by the District Court)

### CHAPTER 26–12.   ABORTION.

26–1201.   Criminal Abortion.   Except as otherwise provided in section 26–1202, a person commits criminal abortion when he administers any medicine, drug or other substance whatever to any woman or when he uses any instrument or other means whatever upon any woman with intent to produce a miscarriage or abortion.

26–1202.   Exception.   (a) Section 26–1201 shall not apply to an abortion performed by a physician duly licensed to practice medicine and surgery pursuant to Chapter 84–9 or 84–12 of the Code of Georgia of 1933, as amended, based upon his best clinical judgment that an abortion is necessary *because:*

*(1) A continuation of the pregnancy would endanger the life of the pregnant woman or would seriously and permanently injure her health; or*

*(2) The fetus would very likely be born with a grave, permanent, and irremediable mental or physical defect; or*

*(3) The pregnancy resulted from forcible or statutory rape.*

(b) No abortion is authorized or shall be performed under this section unless each of the following conditions is met:

(1) The pregnant woman requesting the abortion certifies in writing under oath and subject to the penalties

of false swearing to the physician who proposes to perform the abortion that she is a bona fide legal resident of the State of Georgia.

(2) The physician certifies that he believes the woman is a bona fide resident of this State and that he has no information which should lead him to believe otherwise.

(3) Such physician's judgment is reduced to writing and concurred in by at least two other physicians duly licensed to practice medicine and surgery pursuant to Chapter 84–9 of the Code of Georgia of 1933, as amended, who certify in writing that based upon their separate personal medical examinations of the pregnant woman, the abortion is, in their judgment, necessary *because of one or more of the reasons enumerated above.*

(4) Such abortion is performed in a hospital licensed by the State Board of Health and accredited by the Joint Commission on Accreditation of Hospitals.

(5) The performance of the abortion has been approved in advance by a committee of the medical staff of the hospital in which the operation is to be performed. This committee must be one established and maintained in accordance with the standards promulgated by the Joint Commission on the Accreditation of Hospitals, and its approval must be by a majority vote of a membership of not less than three members of the hospital's staff; the physician proposing to perform the operation may not be counted as a member of the committee for this purpose.

*(6) If the proposed abortion is considered necessary because the woman has been raped, the woman makes a written statement under oath, and subject to the penalties of false swearing, of the date, time and place of the rape and the name of the rapist, if known. There must be attached to this statement a certified copy of any report of the rape made by any law enforcement officer or agency and a statement by the solicitor general of the*

*judicial circuit where the rape occurred or allegedly occurred that, according to his best information, there is probable cause to believe that the rape did occur.*

(7) Such written opinions, statements, certificates, and concurrences are maintained in the permanent files of such hospital and are available at all reasonable times to the solicitor general of the judicial circuit in which the hospital is located.

(8) A copy of such written opinions, statements, certificates, and concurrences is filed with the Director of the State Department of Public Health within 10 days after such operation is performed.

(9) All written opinions, statements, certificates, and concurrences filed and maintained pursuant to paragraphs (7) and (8) of this subsection shall be confidential records and shall not be made available for public inspection at any time.

*(c) Any solicitor general of the judicial circuit in which an abortion is to be performed under this section, or any person who would be a relative of the child within the second degree of consanguinity, may petition the superior court of the county in which the abortion is to be performed for a declaratory judgment whether the performance of such abortion would violate any constitutional or other legal rights of the fetus. Such solicitor general may also petition such court for the purpose of taking issue with compliance with the requirements of this section. The physician who proposes to perform the abortion and the pregnant woman shall be respondents. The petition shall be heard expeditiously and if the court adjudges that such abortion would violate the constitutional or other legal rights of the fetus, the court shall so declare and shall restrain the physician from performing the abortion.*

(d) If an abortion is performed in compliance with this section, the death of the fetus shall not give rise to any claim for wrongful death.

(e) Nothing in this section shall require a hospital to admit any patient under the provisions hereof for the purpose of performing an abortion, nor shall any hospital be required to appoint a committee such as contemplated under subsection (b) (5). A physician, or any other person who is a member of or associated with the staff of a hospital, or any employee of a hospital in which an abortion has been authorized, who shall state in writing an objection to such abortion on moral or religious grounds shall not be required to participate in the medical procedures which will result in the abortion, and the refusal of any such person to participate therein shall not form the basis of any claim for damages on account of such refusal or for any disciplinary or recriminatory action against such person.

26–1203. Punishment. A person convicted of criminal abortion shall be punished by imprisonment for not less than one nor more than 10 years.

## APPENDIX B TO OPINION OF THE COURT

### American Law Institute

### MODEL PENAL CODE

Section 230.3. Abortion.

(1) *Unjustified Abortion.* A person who purposely and unjustifiably terminates the pregnancy of another otherwise than by a live birth commits a felony of the third degree or, where the pregnancy has continued beyond the twenty-sixth week, a felony of the second degree.

(2) *Justifiable Abortion.* A licensed physician is justified in terminating a pregnancy if he believes there is substantial risk that continuance of the pregnancy would gravely impair the physical or mental health of the mother or that the child would be born with grave physical or mental defect, or that the pregnancy resulted from rape, incest, or other felonious intercourse. All

illicit intercourse with a girl below the age of 16 shall be deemed felonious for purposes of this subsection. Justifiable abortions shall be performed only in a licensed hospital except in case of emergency when hospital facilities are unavailable. [Additional exceptions from the requirement of hospitalization may be incorporated here to take account of situations in sparsely settled areas where hospitals are not generally accessible.]

(3) *Physicians' Certificates; Presumption from Non-Compliance.* No abortion shall be performed unless two physicians, one of whom may be the person performing the abortion, shall have certified in writing the circumstances which they believe to justify the abortion. Such certificate shall be submitted before the abortion to the hospital where it is to be performed and, in the case of abortion following felonious intercourse, to the prosecuting attorney or the police. Failure to comply with any of the requirements of this Subsection gives rise to a presumption that the abortion was unjustified.

(4) *Self-Abortion.* A woman whose pregnancy has continued beyond the twenty-sixth week commits a felony of the third degree if she purposely terminates her own pregnancy otherwise than by a live birth, or if she uses instruments, drugs or violence upon herself for that purpose. Except as justified under Subsection (2), a person who induces or knowingly aids a woman to use instruments, drugs or violence upon herself for the purpose of terminating her pregnancy otherwise than by a live birth commits a felony of the third degree whether or not the pregnancy has continued beyond the twenty-sixth week.

(5) *Pretended Abortion.* A person commits a felony of the third degree if, representing that it is his purpose to perform an abortion, he does an act adapted to cause abortion in a pregnant woman although the woman is in fact not pregnant, or the actor does not believe she is.

A person charged with unjustified abortion under Subsection (1) or an attempt to commit that offense may be convicted thereof upon proof of conduct prohibited by this Subsection.

(6) *Distribution of Abortifacients.* A person who sells, offers to sell, possesses with intent to sell, advertises, or displays for sale anything specially designed to terminate a pregnancy, or held out by the actor as useful for that purpose, commits a misdemeanor, unless:

(a) the sale, offer or display is to a physician or druggist or to an intermediary in a chain of distribution to physicians or druggists; or

(b) the sale is made upon prescription or order of a physician; or

(c) the possession is with intent to sell as authorized in paragraphs (a) and (b); or

(d) the advertising is addressed to persons named in paragraph (a) and confined to trade or professional channels not likely to reach the general public.

(7) *Section Inapplicable to Prevention of Pregnancy.* Nothing in this Section shall be deemed applicable to the prescription, administration or distribution of drugs or other substances for avoiding pregnancy, whether by preventing implantation of a fertilized ovum or by any other method that operates before, at or immediately after fertilization.

MR. CHIEF JUSTICE BURGER, concurring[*]

I agree that, under the Fourteenth Amendment to the Constitution, the abortion statutes of Georgia and Texas impermissibly limit the performance of abortions necessary to protect the health of pregnant women, using

---

[*][This opinion applies also to No. 70–18, *Roe* v. *Wade, ante,* p. 113.]

the term health in its broadest medical context. See *United States* v. *Vuitch,* 402 U. S. 62, 71–72 (1971). I am somewhat troubled that the Court has taken notice of various scientific and medical data in reaching its conclusion; however, I do not believe that the Court has exceeded the scope of judicial notice accepted in other contexts.

In oral argument, counsel for the State of Texas informed the Court that early abortion procedures were routinely permitted in certain exceptional cases, such as nonconsensual pregnancies resulting from rape and incest. In the face of a rigid and narrow statute, such as that of Texas, no one in these circumstances should be placed in a posture of dependence on a prosecutorial policy or prosecutorial discretion. Of course, States must have broad power, within the limits indicated in the opinions, to regulate the subject of abortions, but where the consequences of state intervention are so severe, uncertainty must be avoided as much as possible. For my part, I would be inclined to allow a State to require the certification of two physicians to support an abortion, but the Court holds otherwise. I do not believe that such a procedure is unduly burdensome, as are the complex steps of the Georgia statute, which require as many as six doctors and the use of a hospital certified by the JCAH.

I do not read the Court's holdings today as having the sweeping consequences attributed to them by the dissenting Justices; the dissenting views discount the reality that the vast majority of physicians observe the standards of their profession, and act only on the basis of carefully deliberated medical judgments relating to life and health. Plainly, the Court today rejects any claim that the Constitution requires abortions on demand.

MR. JUSTICE DOUGLAS, concurring*

While I join the opinion of the Court,[1] I add a few words.

## I

The questions presented in the present cases go far beyond the issues of vagueness, which we considered in *United States* v. *Vuitch,* 402 U. S. 62. They involve the right of privacy, one aspect of which we considered in *Griswold* v. *Connecticut,* 381 U. S. 479, 484, when we held that various guarantees in the Bill of Rights create zones of privacy.[2]

---

*[This opinion applies also to No. 70-18, *Roe* v. *Wade, ante,* p. 113.]

[1] I disagree with the dismissal of Dr. Hallford's complaint in intervention in *Roe* v. *Wade, ante,* p. 113, because my disagreement with *Younger* v. *Harris,* 401 U. S. 37, revealed in my dissent in that case, still persists and extends to the progeny of that case.

[2] There is no mention of privacy in our Bill of Rights but our decisions have recognized it as one of the fundamental values those amendments were designed to protect. The fountainhead case is *Boyd* v. *United States,* 116 U. S. 616, holding that a federal statute which authorized a court in tax cases to require a taxpayer to produce his records or to concede the Government's allegations offended the Fourth and Fifth Amendments. Mr. Justice Bradley, for the Court, found that the measure unduly intruded into the "sanctity of a man's home and the privacies of life." *Id.,* at 630. Prior to *Boyd,* in *Kilbourn* v. *Thompson,* 103 U. S. 168, 190, Mr. Justice Miller held for the Court that neither House of Congress "possesses the general power of making inquiry into the private affairs of the citizen." Of *Kilbourn,* Mr. Justice Field later said, "This case will stand for all time as a bulwark against the invasion of the right of the citizen to protection in his private affairs against the unlimited scrutiny of investigation by a congressional committee." *In re Pacific Railway Comm'n,* 32 F. 241, 253 (cited with approval in *Sinclair* v. *United States,* 279 U. S. 263, 293). Mr. Justice Harlan, also speaking for the Court, in *ICC* v. *Brimson,* 154 U. S. 447, 478, thought the same was true of

The *Griswold* case involved a law forbidding the use of contraceptives. We held that law as applied to married people unconstitutional:

> "We deal with a right of privacy older than the Bill of Rights—older than our political parties, older than our school system. Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred." *Id.,* at 486.

The District Court in *Doe* held that *Griswold* and related cases "establish a Constitutional right to privacy broad enough to encompass the right of a woman to terminate an unwanted pregnancy in its early stages, by obtaining an abortion." 319 F. Supp. 1048, 1054.

The Supreme Court of California expressed the same view in *People* v. *Belous,*[3] 71 Cal. 2d 954, 963, 458 P. 2d 194, 199.

The Ninth Amendment obviously does not create federally enforceable rights. It merely says, "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." But a catalogue of these rights includes customary, traditional, and time-honored rights, amenities, privileges, and immunities that come within the sweep of "the Blessings of Liberty" mentioned in the preamble to the Constitution. Many of them, in my view, come

---

administrative inquiries, saying that the Constitution did not permit a "general power of making inquiry into the private affairs of the citizen." In a similar vein were *Harriman* v. *ICC,* 211 U. S. 407; *United States* v. *Louisville & Nashville R. Co.,* 236 U. S. 318, 335; and *FTC* v. *American Tobacco Co.,* 264 U. S. 298.

[3] The California abortion statute, held unconstitutional in the *Belous* case, made it a crime to perform or help perform an abortion "unless the same is necessary to preserve [the mother's] life." 71 Cal. 2d, at 959, 458 P. 2d, at 197.

within the meaning of the term "liberty" as used in the Fourteenth Amendment.

*First is the autonomous control over the development and expression of one's intellect, interests, tastes, and personality.*

These are rights protected by the First Amendment and, in my view, they are absolute, permitting of no exceptions. See *Terminiello* v. *Chicago,* 337 U. S. 1; *Roth* v. *United States,* 354 U. S. 476, 508 (dissent); *Kingsley Pictures Corp.* v. *Regents,* 360 U. S. 684, 697 (concurring); *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 293 (Black, J., concurring, in which I joined). The Free Exercise Clause of the First Amendment is one facet of this constitutional right. The right to remain silent as respects one's own beliefs, *Watkins* v. *United States,* 354 U. S. 178, 196–199, is protected by the First and the Fifth. The First Amendment grants the privacy of first-class mail, *United States* v. *Van Leeuwen,* 397 U. S. 249, 253. All of these aspects of the right of privacy are rights "retained by the people" in the meaning of the Ninth Amendment.

*Second is freedom of choice in the basic decisions of one's life respecting marriage, divorce, procreation, contraception, and the education and upbringing of children.*

These rights, unlike those protected by the First Amendment, are subject to some control by the police power. Thus, the Fourth Amendment speaks only of "unreasonable searches and seizures" and of "probable cause." These rights are "fundamental," and we have held that in order to support legislative action the statute must be narrowly and precisely drawn and that a "compelling state interest" must be shown in support of the limitation. *E. g., Kramer* v. *Union Free School District,* 395 U. S. 621; *Shapiro* v. *Thompson,* 394 U. S. 618;

*Carrington* v. *Rash,* 380 U. S. 89; *Sherbert* v. *Verner,* 374 U. S. 398; *NAACP* v. *Alabama,* 357 U. S. 449.

The liberty to marry a person of one's own choosing, *Loving* v. *Virginia,* 388 U. S. 1; the right of procreation, *Skinner* v. *Oklahoma,* 316 U. S. 535; the liberty to direct the education of one's children, *Pierce* v. *Society of Sisters,* 268 U. S. 510, and the privacy of the marital relation, *Griswold* v. *Connecticut, supra,* are in this category.[4]

---

[4] My Brother STEWART, writing in *Roe* v. *Wade, supra,* says that our decision in *Griswold* reintroduced substantive due process that had been rejected in *Ferguson* v. *Skrupa,* 372 U. S. 726. *Skrupa* involved legislation governing a business enterprise; and the Court in that case, as had Mr. Justice Holmes on earlier occasions, rejected the idea that "liberty" within the meaning of the Due Process Clause of the Fourteenth Amendment was a vessel to be filled with one's personal choices of values, whether drawn from the *laissez faire* school, from the socialistic school, or from the technocrats. *Griswold* involved legislation touching on the marital relation and involving the conviction of a licensed physician for giving married people information concerning contraception. There is nothing specific in the Bill of Rights that covers that item. Nor is there anything in the Bill of Rights that in terms protects the right of association or the privacy in one's association. Yet we found those rights in the periphery of the First Amendment. *NAACP* v. *Alabama,* 357 U. S. 449, 462. Other peripheral rights are the right to educate one's children as one chooses, *Pierce* v. *Society of Sisters,* 268 U. S. 510, and the right to study the German language, *Meyer* v. *Nebraska,* 262 U. S. 390. These decisions, with all respect, have nothing to do with substantive due process. One may think they are not peripheral to other rights that are expressed in the Bill of Rights. But that is not enough to bring into play the protection of substantive due process.

There are, of course, those who have believed that the reach of due process in the Fourteenth Amendment included all of the Bill of Rights but went further. Such was the view of Mr. Justice Murphy and Mr. Justice Rutledge. See *Adamson* v. *California,* 332 U. S. 46, 123, 124 (dissenting opinion). Perhaps they were right; but it is a bridge that neither I nor those who joined the Court's opinion in *Griswold* crossed.

Only last Term in *Eisenstadt* v. *Baird,* 405 U. S. 438, another contraceptive case, we expanded the concept of *Griswold* by saying:

> "It is true that in *Griswold* the right of privacy in question inhered in the marital relationship. Yet the marital couple is not an independent entity with a mind and heart of its own, but an association of two individuals each with a separate intellectual and emotional makeup. If the right of privacy means anything, it is the right of the *individual,* married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Id.,* at 453.

This right of privacy was called by Mr. Justice Brandeis the right "to be let alone." *Olmstead* v. *United States,* 277 U. S. 438, 478 (dissenting opinion). That right includes the privilege of an individual to plan his own affairs, for, " 'outside areas of plainly harmful conduct, every American is left to shape his own life as he thinks best, do what he pleases, go where he pleases.' " *Kent* v. *Dulles,* 357 U. S. 116, 126.

*Third is the freedom to care for one's health and person, freedom from bodily restraint or compulsion, freedom to walk, stroll, or loaf.*

These rights, though fundamental, are likewise subject to regulation on a showing of "compelling state interest." We stated in *Papachristou* v. *City of Jacksonville,* 405 U. S. 156, 164, that walking, strolling, and wandering "are historically part of the amenities of life as we have known them." As stated in *Jacobson* v. *Massachusetts,* 197 U. S. 11, 29:

> "There is, of course, a sphere within which the individual may assert the supremacy of his own will

and rightfully dispute the authority of any human government, especially of any free government existing under a written constitution, to interfere with the exercise of that will."

In *Union Pacific R. Co.* v. *Botsford,* 141 U. S. 250, 252, the Court said, "The inviolability of the person is as much invaded by a compulsory stripping and exposure as by a blow."

In *Terry* v. *Ohio,* 392 U. S. 1, 8–9, the Court, in speaking of the Fourth Amendment stated, "This inestimable right of personal security belongs as much to the citizen on the streets of our cities as to the homeowner closeted in his study to dispose of his secret affairs."

*Katz* v. *United States,* 389 U. S. 347, 350, emphasizes that the Fourth Amendment "protects individual privacy against certain kinds of governmental intrusion."

In *Meyer* v. *Nebraska,* 262 U. S. 390, 399, the Court said:

"Without doubt, [liberty] denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men."

The Georgia statute is at war with the clear message of these cases—that a woman is free to make the basic decision whether to bear an unwanted child. Elaborate argument is hardly necessary to demonstrate that childbirth may deprive a woman of her preferred lifestyle and force upon her a radically different and undesired future. For example, rejected applicants under the Georgia statute are required to endure the

discomforts of pregnancy; to incur the pain, higher mortality rate, and aftereffects of childbirth; to abandon educational plans; to sustain loss of income; to forgo the satisfactions of careers; to tax further mental and physical health in providing child care; and, in some cases, to bear the lifelong stigma of unwed motherhood, a badge which may haunt, if not deter, later legitimate family relationships.

## II

Such reasoning is, however, only the beginning of the problem. The State has interests to protect. Vaccinations to prevent epidemics are one example, as *Jacobson, supra,* holds. The Court held that compulsory sterilization of imbeciles afflicted with hereditary forms of insanity or imbecility is another. *Buck* v. *Bell,* 274 U. S. 200. Abortion affects another. While childbirth endangers the lives of some women, voluntary abortion at any time and place regardless of medical standards would impinge on a rightful concern of society. The woman's health is part of that concern; as is the life of the fetus after quickening. These concerns justify the State in treating the procedure as a medical one.

One difficulty is that this statute as construed and applied apparently does not give full sweep to the "psychological as well as physical well-being" of women patients which saved the concept "health" from being void for vagueness in *United States* v. *Vuitch,* 402 U. S., at 72. But, apart from that, Georgia's enactment has a constitutional infirmity because, as stated by the District Court, it "limits the number of reasons for which an abortion may be sought." I agree with the holding of the District Court, "This the State may not do, because such action unduly restricts a decision sheltered by the Constitutional right to privacy." 319 F. Supp., at 1056.

The vicissitudes of life produce pregnancies which may be unwanted, or which may impair "health" in

the broad *Vuitch* sense of the term, or which may imperil the life of the mother, or which in the full setting of the case may create such suffering, dislocations, misery, or tragedy as to make an early abortion the only civilized step to take.   These hardships may be properly embraced in the "health" factor of the mother as appraised by a person of insight.   Or they may be part of a broader medical judgment based on what is "appropriate" in a given case, though perhaps not "necessary" in a strict sense.

The "liberty" of the mother, though rooted as it is in the Constitution, may be qualified by the State for the reasons we have stated.   But where fundamental personal rights and liberties are involved, the corrective legislation must be "narrowly drawn to prevent the supposed evil," *Cantwell* v. *Connecticut,* 310 U. S. 296, 307, and not be dealt with in an "unlimited and indiscriminate" manner.   *Shelton* v. *Tucker,* 364 U. S. 479, 490. And see *Talley* v. *California,* 362 U. S. 60.   Unless regulatory measures are so confined and are addressed to the specific areas of compelling legislative concern, the police power would become the great leveler of constitutional rights and liberties.

There is no doubt that the State may require abortions to be performed by qualified medical personnel. The legitimate objective of preserving the mother's health clearly supports such laws.   Their impact upon the woman's privacy is minimal.   But the Georgia statute outlaws virtually all such operations—even in the earliest stages of pregnancy.   In light of modern medical evidence suggesting that an early abortion is safer healthwise than childbirth itself,[5] it cannot be seriously

---

[5] Many studies show that it is safer for a woman to have a medically induced abortion than to bear a child.   In the first 11 months of operation of the New York abortion law, the mortality

urged that so comprehensive a ban is aimed at protecting the woman's health. Rather, this expansive proscription of all abortions along the temporal spectrum can rest only on a public goal of preserving both embryonic and fetal life.

The present statute has struck the balance between the woman's and the State's interests wholly in favor of the latter. I am not prepared to hold that a State may equate, as Georgia has done, all phases of maturation preceding birth. We held in *Griswold* that the States may not preclude spouses from attempting to avoid the joinder of sperm and egg. If this is true, it is difficult to perceive any overriding public necessity which might attach precisely at the moment of conception. As Mr. Justice Clark has said: [6]

> "To say that life is present at conception is to give recognition to the potential, rather than the actual. The unfertilized egg has life, and if fertilized, it takes on human proportions. But the law deals in reality, not obscurity—the known rather than the unknown. When sperm meets egg life may eventually form, but quite often it does not. The law does not deal in speculation. The phenomenon of

---

rate associated with such operations was six per 100,000 operations. Abortion Mortality, 20 Morbidity and Mortality 208, 209 (June 1971) (U. S. Dept. of HEW, Public Health Service). On the other hand, the maternal mortality rate associated with childbirths other than abortions was 18 per 100,000 live births. Tietze, Mortality with Contraception and Induced Abortion, 45 Studies in Family Planning 6 (1969). See also Tietze & Lehfeldt, Legal Abortion in Eastern Europe, 175 J. A. M. A. 1149, 1152 (Apr. 1961); Kolblova, Legal Abortion in Czechoslovakia, 196 J. A. M. A. 371 (Apr. 1966); Mehland, Combating Illegal Abortion in the Socialist Countries of Europe, 13 World Med. J. 84 (1966).

[6] Religion, Morality, and Abortion: A Constitutional Appraisal, 2 Loyola U. (L. A.) L. Rev. 1, 9–10 (1969).

life takes time to develop, and until it is actually present, it cannot be destroyed. Its interruption prior to formation would hardly be homicide, and as we have seen, society does not regard it as such. The rites of Baptism are not performed and death certificates are not required when a miscarriage occurs. No prosecutor has ever returned a murder indictment charging the taking of the life of a fetus.[7] This would not be the case if the fetus constituted human life."

In summary, the enactment is overbroad. It is not closely correlated to the aim of preserving prenatal life. In fact, it permits its destruction in several cases, including pregnancies resulting from sex acts in which unmarried females are below the statutory age of consent. At the same time, however, the measure broadly proscribes aborting other pregnancies which may cause severe mental disorders. Additionally, the statute is overbroad because it equates the value of embryonic life immediately after conception with the worth of life immediately before birth.

### III

Under the Georgia Act, the mother's physician is not the sole judge as to whether the abortion should be performed. Two other licensed physicians must concur in his judgment.[8] Moreover, the abortion must be performed in a licensed hospital; [9] and the abortion must be

---

[7] In *Keeler* v. *Superior Court,* 2 Cal. 3d 619, 470 P. 2d 617, the California Supreme Court held in 1970 that the California murder statute did not cover the killing of an unborn fetus, even though the fetus be "viable," and that it was beyond judicial power to extend the statute to the killing of an unborn. It held that the child must be "born alive before a charge of homicide can be sustained." *Id.,* at 639, 470 P. 2d, at 630.

[8] See Ga. Code Ann. § 26–1202 (b) (3).

[9] See *id.,* § 26–1202 (b) (4).

approved in advance by a committee of the medical staff of that hospital.[10]

Physicians, who speak to us in *Doe* through an *amicus* brief, complain of the Georgia Act's interference with their practice of their profession.

The right of privacy has no more conspicuous place than in the physician-patient relationship, unless it be in the priest-penitent relationship.

It is one thing for a patient to agree that her physician may consult with another physician about her case. It is quite a different matter for the State compulsorily to impose on that physician-patient relationship another layer or, as in this case, still a third layer of physicians. The right of privacy—the right to care for one's health and person and to seek out a physician of one's own choice protected by the Fourteenth Amendment—becomes only a matter of theory, not a reality, when a multiple-physician-approval system is mandated by the State.

The State licenses a physician. If he is derelict or faithless, the procedures available to punish him or to deprive him of his license are well known. He is entitled to procedural due process before professional disciplinary sanctions may be imposed. See *In re Ruffalo*, 390 U. S. 544. Crucial here, however, is state-imposed control over the medical decision whether pregnancy should be interrupted. The good-faith decision of the patient's chosen physician is overridden and the final decision passed on to others in whose selection the patient has no part. This is a total destruction of the right of privacy between physician and patient and the intimacy of relation which that entails.

The right to seek advice on one's health and the right to place reliance on the physician of one's choice are

---

[10] *Id.,* § 26–1202 (b) (5).

basic to Fourteenth Amendment values. We deal with fundamental rights and liberties, which, as already noted, can be contained or controlled only by discretely drawn legislation that preserves the "liberty" and regulates only those phases of the problem of compelling legislative concern. The imposition by the State of group controls over the physician-patient relationship is not made on any medical procedure apart from abortion, no matter how dangerous the medical step may be. The oversight imposed on the physician and patient in abortion cases denies them their "liberty," *viz.*, their right of privacy, without any compelling, discernible state interest.

Georgia has constitutional warrant in treating abortion as a medical problem. To protect the woman's right of privacy, however, the control must be through the physician of her choice and the standards set for his performance.

The protection of the fetus when it has acquired life is a legitimate concern of the State. Georgia's law makes no rational, discernible decision on that score.[11] For under the Code, the developmental stage of the fetus is irrelevant when pregnancy is the result of rape, when the fetus will very likely be born with a permanent defect, or when a continuation of the pregnancy will endanger the life of the mother or permanently injure her health. When life is present is a question we do not try to resolve. While basically a question for medical experts, as stated by Mr. Justice Clark,[12] it is, of course, caught up in matters of religion and morality.

In short, I agree with the Court that endangering the life of the woman or seriously and permanently injuring

---

[11] See Rochat, Tyler, & Schoenbucher, An Epidemiological Analysis of Abortion in Georgia, 61 Am. J. of Public Health 543 (1971).

[12] *Supra*, n. 6, at 10.

her health are standards too narrow for the right of privacy that is at stake.

I also agree that the superstructure of medical supervision which Georgia has erected violates the patient's right of privacy inherent in her choice of her own physician.

MR. JUSTICE WHITE, with whom MR. JUSTICE REHNQUIST joins, dissenting.*

At the heart of the controversy in these cases are those recurring pregnancies that pose no danger whatsoever to the life or health of the mother but are, nevertheless, unwanted for any one or more of a variety of reasons—convenience, family planning, economics, dislike of children, the embarrassment of illegitimacy, etc. The common claim before us is that for any one of such reasons, or for no reason at all, and without asserting or claiming any threat to life or health, any woman is entitled to an abortion at her request if she is able to find a medical advisor willing to undertake the procedure.

The Court for the most part sustains this position: During the period prior to the time the fetus becomes viable, the Constitution of the United States values the convenience, whim, or caprice of the putative mother more than the life or potential life of the fetus; the Constitution, therefore, guarantees the right to an abortion as against any state law or policy seeking to protect the fetus from an abortion not prompted by more compelling reasons of the mother.

With all due respect, I dissent. I find nothing in the language or history of the Constitution to support the Court's judgment. The Court simply fashions and announces a new constitutional right for pregnant mothers

---

*[This opinion applies also to No. 70–18, *Roe* v. *Wade, ante,* p. 113.]

and, with scarcely any reason or authority for its action, invests that right with sufficient substance to override most existing state abortion statutes. The upshot is that the people and the legislatures of the 50 States are constitutionally disentitled to weigh the relative importance of the continued existence and development of the fetus, on the one hand, against a spectrum of possible impacts on the mother, on the other hand. As an exercise of raw judicial power, the Court perhaps has authority to do what it does today; but in my view its judgment is an improvident and extravagant exercise of the power of judicial review that the Constitution extends to this Court.

The Court apparently values the convenience of the pregnant mother more than the continued existence and development of the life or potential life that she carries. Whether or not I might agree with that marshaling of values, I can in no event join the Court's judgment because I find no constitutional warrant for imposing such an order of priorities on the people and legislatures of the States. In a sensitive area such as this, involving as it does issues over which reasonable men may easily and heatedly differ, I cannot accept the Court's exercise of its clear power of choice by interposing a constitutional barrier to state efforts to protect human life and by investing mothers and doctors with the constitutionally protected right to exterminate it. This issue, for the most part, should be left with the people and to the political processes the people have devised to govern their affairs.

It is my view, therefore, that the Texas statute is not constitutionally infirm because it denies abortions to those who seek to serve only their convenience rather than to protect their life or health. Nor is this plaintiff, who claims no threat to her mental or physical health, entitled to assert the possible rights of those women

whose pregnancy assertedly implicates their health. This, together with *United States* v. *Vuitch,* 402 U. S. 62 (1971), dictates reversal of the judgment of the District Court.

Likewise, because Georgia may constitutionally forbid abortions to putative mothers who, like the plaintiff in this case, do not fall within the reach of § 26–1202 (a) of its criminal code, I have no occasion, and the District Court had none, to consider the constitutionality of the procedural requirements of the Georgia statute as applied to those pregnancies posing substantial hazards to either life or health. I would reverse the judgment of the District Court in the Georgia case.

MR. JUSTICE REHNQUIST, dissenting.

The holding in *Roe* v. *Wade, ante,* p. 113, that state abortion laws can withstand constitutional scrutiny only if the State can demonstrate a compelling state interest, apparently compels the Court's close scrutiny of the various provisions in Georgia's abortion statute. Since, as indicated by my dissent in *Wade,* I view the compelling-state-interest standard as an inappropriate measure of the constitutionality of state abortion laws, I respectfully dissent from the majority's holding.