STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
BETTY NORFLETT, DEFENDANT-APPELLANT.

Argued March 3, 1975—Decided May 8, 1975.

270

*Mr. William L. Roughton, Jr.,* Assistant Deputy Public
Defender, argued the cause for defendant-appellant (*Mr.
Stanley C. Van Ness,* Public Defender, attorney; *Mr. Edward P. Hannigan,* Assistant Deputy Public Defender, of
counsel).

*Ms. Jane E. Deaterly,* Deputy Attorney General, argued the
cause for plaintiff-respondent (*Mr. William F. Hyland,* Attorney General of New Jersey, attorney; *Mr. Marc J. Friedman,* Deputy Attorney General, of counsel).

The opinion of the Court was delivered by
· PASHMAN, J. This appeal requires us to consider the impact of *Roe v. Wade,* 410 *U. S.* 113, 93 S. Ct. 705, 35 L. Ed.
2d 147 (1973) and *Doe v. Bolton,* 410 *U. S.* 179, 93 S. Ct.
739, 35 L. Ed. 2d 201 (1973), upon our abortion statute in

the context of a criminal conviction of a layman performing an abortion upon an unmarried minor. We conclude that defendant's conviction must be affirmed.

Betty Norflett was indicted on three counts charging her with performing an abortion without lawful justification, atrocious assault and battery by reason of the abortion, and contributing to the delinquency of a minor. Defendant moved for dismissal of the indictment on the grounds that the New Jersey abortion statute was unconstitutional which motion was denied.

The State's principal witness, the victim of the abortion, was a 17-year-old high school student when the procedure was performed. She testified that she had gone to a physician's office for a pregnancy test in December 1972 and while she was waiting to see the doctor defendant approached her asking if she was there for a pregnancy test.[1] When the witness responded in the affirmative, defendant replied that she was the one to see if the witness did not want the child. Later, in the doctor's office, defendant came in and gave her a piece of paper with her name and address on it. Following the examination which confirmed the witness's pregnancy, defendant offered her a ride home, and in the car told her to call that night to make further arrangements.

The witness and defendant ultimately agreed on a fee of $100 for the abortion, half of which the witness paid defendant in advance.[2] The abortion was attempted on the following Wednesday at the witness's brother's apartment; after the procedure, defendant only told the witness to drink hot liquids and take aspirin. The witness subsequently paid an additional $25 in two installments. When she expressed con-

---

[1]Although the witness testified that she had seen defendant on the street, she had never had any previous personal contact with her. Defendant was also a patient of the physician who examined the witness.

[2]The witness also stated that although she initially represented her age as 21, she later told defendant her true age.

cern about whether the abortion was successful, defendant agreed to repeat the procedure.

On Friday of the next week, defendant again attempted to abort the witness, this time at defendant's residence. The witness observed blood on the following day but experienced no further difficulty until early January, when she began to bleed again. The bleeding continued, and finally on a Friday in mid-January, the witness's discomfort became so acute that she was forced to leave her supermarket job early.[3] Fearful of her parents' reaction to the abortion, however, the witness told her father that she was suffering from constipation. She continued the deception when she was examined at a hospital that evening and, consequently, the witness was sent home after receiving a prescription.

The next evening, however, the pain became so severe that the witness could not lie down or sit down and she finally told her mother the truth.[4] The witness was immediately taken to the hospital where her condition was diagnosed as a possible incomplete septic abortion. She was given large doses of penicillin and then a dilation and curetting of the uterine cavity was performed, resulting in the removal of a 12-14 week old fetus.[5] The witness was confined to the hos-

---

[3]The witness stated that at this point she "was having all kinds of pain and I had been bleeding for a long time."

[4]When asked why she finally told her parents the truth, the witness responded:

Because 1 couldn't stand the pain and I couldn't get in touch with Miss Norflett and if I kept lying to the doctors, they couldn't help me.

[5]The treating physician testified that the witness's cervix was approximately 80% defaced when he examined her, indicating that she was having labor. The doctor added, however, that it was not possible to tell from an internal examination whether a hard instrument had been used on the patient. When he was questioned about his diagnosis of the patient's condition, the doctor testified that although he could not verify an infection, he treated the witness on the assumption that she was suffering from a septic abortion, a condition which can kill the patient.

pital for three days and subsequently missed two months of school.

At the close of the State's case, the trial court dismissed the count of the indictment charging defendant with atrocious assault and battery on the ground that the evidence failed to establish a prima facie case. The court, however, declined to grant defendant's motions for acquittal on the other two counts.

Defendant elected to testify on her own behalf. Although she admitted that she had spoken to the witness in December 1972, she denied performing the abortion or having any knowledge about it. According to defendant, the witness came to her home seeking her help as a community worker. When she learned that the witness was pregnant, defendant claimed that her only advice was to tell her mother and go to Planned Parenthood. The defense stipulated that defendant is neither a physician nor a nurse. On cross-examination she admitted that she had never had any medical training whatsoever, not even a first aid course.

The jury convicted her on both remaining counts of the indictment.

The defense moved for a new trial in October 1973 on the ground that the verdict was against the weight of the evidence, contrary to law and a manifest denial of justice. The court denied the motion and sentenced defendant to a term of 3–5 years on the abortion count and a term of 1–3 years on the count charging her with contributing to the delinquency of a minor. The sentences were to be served concurrently at the New Jersey Correctional Institution for Women.

While the matter was pending unheard in the Appellate Division, we certified the appeal directly to this Court pursuant to *R.* 2:12–1, 67 *N. J.* 105 (1975), to consider the propriety of defendant's prosecution and conviction under our abortion statute in light of *Roe* and *Doe, supra.*

I

Defendant has consistently argued that our abortion statute, *N. J. S. A.* 2A:87–1[6] has been invalidated completely as a result of *Roe* and *Doe, supra,* and *Y. W. C. A. v. Kugler,* 342 *F. Supp.* 1048 (D. N. J. 1972), vacated and remanded, 475 *F.* 2d 1398 (3 Cir. 1973), judgment reinstated, Civil No. 264–70 (D. N. J. July 24, 1973), aff'd mem., 493 *F.* 2d 1402 (3 Cir. 1974), *cert.* den., 415 *U. S.* 989, 94 S. Ct. 1587, 39 L. Ed. 2d 885 (1974). Thus, she contends that her prosecution and conviction pursuant to the statute were improper. The State, in addition to denying the validity of her contentions on their merits, questions the standing of this defendant to raise these constitutional issues.

Defendant's attack on *N. J. S. A.* 2A:87–1 is essentially twofold. Relying on *Roe, Doe* and *Kugler,* she, seeking to assert the constitutional right of pregnant women to obtain abortions, advances the defense that the statute is unconstitutional *in toto* and is impermissibly vague. While we entertain serious doubts that this defendant has standing to raise these issues,[7] we decline to resolve this appeal on pro-

---

[6]*N. J. S. A.* 2A:87–1 provides:

Any person who, maliciously or without lawful justification, with intent to cause or procure the miscarriage of a pregnant woman, administers or prescribes or advises or directs her to take or swallow any poison, drug, medicine or noxious thing, or uses any instrument or means whatever, is guilty of a high misdemeanor.

If as a consequence the woman or child shall die, the offender shall be punished by a fine of not more than $5,000, or by imprisonment for not more than 15 years, or both.

[7]Our doubt concerning defendant's standing to assert the privacy rights of pregnant women in her defense is predicated on the general principle that normally an individual will only be permitted to seek judicial vindication of his own rights. *See, e. g., Barrows v. Jackson,* 346 *U. S.* 249, 255, 73 S. Ct. 1031, 1034, 97 L. Ed. 1586 (1953):

Ordinarily, one may not claim standing in this Court to vindicate the constitutional rights of some third party.

*See generally* 3 Davis, *Administrative Law,* § 22.07 at 232 (1958).

cedural grounds in the belief that the public interest requires us to consider the impact of *Roe* and *Doe* upon our abortion statute, at least insofar as it is applied to abortions performed by individuals without medical training. See *Busik v. Levine,* 63 *N. J.* 351, 363–64 (1973), appeal dismissed, 414 *U. S.* 1106, 94 S. Ct. 831, 38 L. Ed. 2d 733 (1973).

The United States Supreme Court has recognized that the question of the legality of abortions is an issue of constitutional dimensions. In two cases decided the same day, the Court sought to reconcile the conflict between the individual's right to privacy in deciding to terminate a pregnancy and the state's interest in promoting maternal health and prenatal life. In *Roe v. Wade,* 410 *U. S.* 113, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973), the Court considered a constitutional attack on the Texas abortion statute by, among others, a single woman who desired to terminate her pregnancy by a " 'competent, licensed physician, under safe, clinical conditions' ", 410 *U. S.* at 120, 93 S. Ct. at 710. The statute under attack was, in the Court's view, similar to those in existence in a majority of the states, and made it a crime to " 'procure an abortion' " as defined by the statute "except with respect to 'an abortion procured or attempted by medical advice for the purpose of saving the life of the mother.' " 410 *U. S.* at 117–18, 93 S. Ct. at 709.[8]

In striking down the Texas statute, the Court chose to rest its decision on the individual's privacy rights in making her election as to the abortion. Conceding that the Constitution does not explicitly recognize any right of privacy, the Court nonetheless concluded that:

The right of privacy, whether it be founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state

---

The standing principle has not always been clearly articulated or uniformly applied. Indeed in *Barrows* the Court relaxed the rule in light of the "unique situation" before it. 346 *U. S.* at 257, 73 S. Ct. 1031. For a recent discussion of the standing concept in this context, see Note, 88 *Harv. L. Rev.* 423 (1974).

[8]The statute is set forth in full at 410 *U. S.* 117 n. 1, 93 S. Ct. 705.

action as we feel it is, or, as the District Court determined, in the Ninth Amendment's reservation of rights to the people, is broad enough to encompass a woman's decision whether or not to terminate her pregnancy. [410 *U. S.* at 153, 93 S. Ct. at 727].

The Court was quick to add, however, that a woman's right to terminate a pregnancy is not an unqualified one, but must be gauged against important state interests. The interests identified by the Court are the state's legitimate concern with the health of the mother and its interest in protecting the potentiality of human life. Although the Court stressed the distinct nature of these interests, it noted that "[e]ach grows in substantiality as the woman approaches term and, at a point during pregnancy, each becomes 'compelling.'" 410 *U. S.* at 162–63, 93 S. Ct. at 731. Consequently, the Court held that with respect to the state's interest in maternal health, reasonable regulation of the abortion procedure is permissible after the end of the first trimester of pregnancy, but prior to this "'compelling' point,"

the attending physician, in consultation with his patient, is free to determine, without regulation by the State, that, in his medical judgment, the patient's pregnancy should be terminated. [410 *U. S.* at 163, 93 S. Ct. at 732].

In the Court's view, however, the state's interest in preserving the prenatal life becomes compelling at a later point in the pregnancy. Reasoning that it is not until viability that the fetus becomes capable of "meaningful life outside the mother's womb," the Court concluded that it is only after the end of the second trimester that a state may proscribe abortion completely "except when it is necessary to preserve the life or health of the mother." 410 *U. S.* at 163–64, 93 S. Ct. at 732.

In the companion case, *Doe v. Bolton,* 410 *U. S.* 179, 93 S. Ct. 739, 35 L. Ed. 2d 201 (1973), the Court analyzed a constitutional attack on a Georgia abortion statute patterned on the American Law Institute's *Model Penal Code,* § 230.3

(Proposed Official Draft 1962).[9] The issues in *Doe,* not pertinent in the instant appeal, focused primarily on the procedural requirements of the Georgia statute. Contrary to the approach of *Roe,* however, the Court declined to invalidate the statute in its entirety, excising only portions of the statute which remained after the district court's disposition.[10]

■ Since this case comes to us in the factual framework of a criminal conviction of a layman for performing an abortion, it is not necessary for us to reconsider *N. J. S. A.* 2A:87-1 broadly in the aftermath of *Roe* and *Doe.* Defendant's situation presents the narrower question of whether, in light of *Roe* and *Doe,* one without any medical training can be convicted under our statute. We conclude that to the extent that it authorizes the criminal prosecution of laymen for performing abortions, *N. J. S. A.* 2A:87-1 survives *Roe* and *Doe.*

Careful scrutiny of *Roe* reveals that even with respect to the first trimester of pregnancy, the Court contemplated that the woman seeking an abortion would exercise her right to privacy in making the decision only after consultation with a physician. Indeed, in summarizing its decision, the Court

---

[9]The statute is set forth in full at Appendix A, 410 *U. S.* at 202–05, 93 S. Ct. 739. *See also* Appendix B, 410 *U. S.* at 205–07, 93 S. Ct. 739, which contains the *Model Penal Code* provisions.

[10]The district court invalidated the statute insofar as it permitted abortions in only three factual situations. *Doe v. Bolton,* 319 *F. Supp.* 1048, 1056 (N. D. Ga. 1970) (three-judge court). On appeal, the Supreme Court characterized the "net result" of the decision as permitting the physician to consider all relevant circumstances in exercising his judgment in this context, *i. e.,* the physical, emotional, psychological, familial, and age factors relevant to the well-being of the patient. 410 *U. S.* at 191–192, 93 S. Ct. 739. The Supreme Court agreed with this approach but went beyond the scope of the district court decision in invalidating the statutory requirements that the abortion be performed in a hospital accredited by the Joint Commission on Accreditation of Hospitals, that the procedure be approved by a hospital abortion committee, that the treating physician's judgment be confirmed by two other doctors, and finally that the woman desiring the abortion be a bona fide resident of the state.

specifically stated that even before the end of the first trimester "the abortion decision *and its effectuation* must be left to the medical judgment of the pregnant woman's attending physician." 410 *U. S.* at 164, 93 S. Ct. at 733 [emphasis supplied]. To avoid any possible misunderstanding the Court added:

The state may define the term "physician," as it has been employed in the preceding [numbered] paragraphs of this Part XI of this opinion, to mean only a physician currently licensed by the State, and may proscribe any abortion by a person who is not a physician as so defined. [410 *U. S.* at 165, 93 S. Ct. at 732].

The courts of other jurisdictions have also concluded that *Roe* and *Doe* do not preclude the enforcement of criminal abortion statutes against laymen. In *People v. Bricker,* 389 *Mich.* 524, 208 *N. W.* 2d 172 (1973), for example, the Supreme Court of Michigan, "seek[ing] to save what we can of the Michigan statutes," *Bricker, supra,* 208 *N. W.* 2d at 174, affirmed a layman's conviction for conspiracy to commit an abortion in a case decided shortly after *Roe* and *Doe.* The purpose of the statute at issue in *Bricker* was to proscribe all abortions "except those required to preserve [the life or] health of the mother." *Bricker, supra,* 208 *N. W.* 2d at 175.[11] After acknowledging that the policy of the state, as evidenced by the abortion statute, must be subordinated to federal constitutional requirements, the court nonetheless concluded that the Michigan statute need not be stricken in its entirety:

The excision from the statute, by constitutional construction, of a certain class, viz., medical professionals, neither affects the balance of the classes coming within the ambit of the clear legislative intent nor exonerates the same from criminal responsibility. In short, we cannot accept as a necessary implication that, because doctors may perform abortions under prescribed circumstances, means that anyone who has or will perform an abortion can do so with impunity. [*Bricker, supra,* 208 *N. W.* 2d at 175-76].

---

[11]*See also Larkin v. Cahalan,* 389 *Mich.* 533, 208 *N. W.* 2d 176, 178 (1973), where the Michigan statutory framework is set out in detail.

In an Arkansas case, *May v. State,* 254 *Ark.* 194, 492 *S. W.* 2d 888 (1973), *cert.* den., 414 *U. S.* 1024, 94 S. Ct. 448, 38 L. Ed. 2d 315 (1973), the state supreme court reached a similar conclusion on the effect of *Roe* and *Doe* on the Arkansas abortion statute. Although the court in *May* reversed defendant's conviction on a charge of inducing an abortion on the grounds that he was denied the right to attack the credibility of some of the state's key witnesses, the court observed that *Roe* and *Doe* did not render the statute unconstitutional as applied to him:

> The most salient aspect of both cases (*Roe* and *Doe*) for the purpose of the appeal in the case at bar is that the decisions in both *Roe* and *Doe* contemplate the performance of abortions only by licensed physicians. [*May, supra,* 492 *S. W.* 2d at 889].

*See also Spears v. Ellis,* 386 *F. Supp.* 653 (S. D. Miss. 1974); *People v. Norton, Colo.,* 507 *P.* 2d 862 (1973) (Georgia-type statute, by implication); *State v. Ingel,* 18 *Md. App.* 514, 308 *A.* 2d 223 (Ct. Spec. App. 1973) (Georgia-type statute, dictum); *Spears v. State, Miss.,* 278 *So.* 2d 443 (1973) (Georgia-type statute). *Contra State v. Hultgren,* 295 *Minn.* 299, 204 *N. W.* 2d 197 (1973) (Texas-type statute); *Commonwealth v. Jackson,* 454 *Pa.* 429, 312 *A.* 2d 13 (1973).[12]

## A

▮ Defendant, however, contends that even if *Roe* and *Doe* do not create a right to an abortion by a layman, the effect of those cases was to totally invalidate *N. J. S. A.* 2A:87–1. The major premise of defendant's argument that *N. J. S. A.* 2A:87–1 is totally invalid is the Court's statement in *Roe*

---

[12]*See also Jackson, supra,* 312 *A.* 2d 13, 14 (Roberts, J. dissenting) where three members of the court expressed the view that nothing in *Roe* or *Doe* prevented the prosecution of an unlicensed physician under the Pennsylvania statute.

that "[o]ur conclusion that Art. 1196 is unconstitutional means, of course, that the Texas abortion statutes, as a unit, must fall." 410 *U. S.* at 166, 93 S. Ct. at 733. Her minor premise is that the Supreme Court categorized *N. J. S. A.* 2A:87–1 in a footnote to the *Roe* opinion as a "Texas-type statute." See 410 *U. S.* at 118 n. 2, 93 S. Ct. 705. From these two propositions defendant draws the conclusion that the New Jersey statute, too, is completely invalid. We disagree.

In concluding that the Texas statute must fall as a unit, the Court was careful to add that this was necessary because the impermissible exception could not be stricken separately since that approach would leave a statute proscribing all abortions "no matter how medically urgent the case." 410 *U. S.* at 166, 93 S. Ct. at 733. Thus with respect to the Texas statute it is apparent that the Court had no opportunity to save the statute by judicial construction. In contrast, *N. J. S. A.* 2A:87–1 by its terms leaves this Court broad discretion in its construction. See *State v. Moretti,* 52 *N. J.* 182 (1968), *cert.* den., 393 *U. S.* 952, 89 S. Ct. 376, 21 L. Ed. 2d 363 (1968); *Gleitman v. Cosgrove,* 49 *N. J.* 22 (1967); *State v. Brandenburg,* 137 *N. J. L.* 124 (Sup. Ct. 1948).

Although this is our first opportunity to consider *N. J. S. A.* 2A:87–1 since *Roe* and *Doe* were decided, the Law Division confronted the same issue in *State v. Haren,* 124 *N. J. Super.* 475 (Law Div. 1973). Judge Larner rejected the arguments now advanced by defendant, declaring:

> The contention of defendants that the statute must fall as a total unit because it does not make a distinction between laymen and physicians is therefore untenable. The statute is and can still remain as a viable basis for a criminal charge where it is sought to be applied to the acts of a layman unsupervised by a physician. Under such circumstances, the acts are "without lawful justification." [*Haren, supra* at 480].[13]

---

[13]In deciding *Haren,* the Law Division observed that after deciding *Roe* and *Doe* the United States Supreme Court denied a petition for *certiorari* in *Cheaney v. Indiana,* 410 *U. S.* 991, 93 S. Ct. 1516,

While it is unnecessary in this case to tailor *N. J. S. A.* 2A:87–1 in detail to the mandate of *Roe* and *Doe,* it is clear that at least insofar as it applies to the prosecution of laymen, our statute remains intact in the wake of those cases.

B

Having concluded that *N. J. S. A.* 2A:87–1 survives *Roe* and *Doe,* at least as it applies to laymen, we must next consider defendant's contention that the phrase, "without lawful justification," is impermissibly vague.

In *Papachristou v. Jacksonville,* 405 *U. S.* 156, 92 S. Ct. 839, 31 L. Ed. 2d 110 (1972), the United States Supreme Court articulated the values which are at the foundation of a void for vagueness argument:

Living under a rule of law entails various suppositions, one of which is that "[all persons] are entitled to be informed as to what the state commands or forbids." [405 *U. S.* at 162, 92 S. Ct. at 843 (quoting from *Lanzetta v. New Jersey,* 306 *U. S.* 451, 452, 59 S. Ct. 618, 83 L. Ed. 888 (1939))].

*See also Grayned v. Rockford,* 408 *U. S.* 104, 108, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972); *Cramp v. Board of Public Instruction,* 368 *U. S.* 278, 287, 82 S. Ct. 275, 7 L. Ed. 2d 285 (1961); *United States v. Harriss,* 347 *U. S.* 612, 617, 74 S. Ct. 808, 98 L. Ed. 989 (1954); *Jordan v. De George,* 341 *U. S.* 223, 230–232, 71 S. Ct. 703, 95 L. Ed. 886

---

36 L. Ed. 2d 189 (1973), a case in which a lay defendant had been convicted under the Indiana abortion statute prior to *Roe* and *Doe.* In that case, the Supreme Court issued a memorandum opinion denying review on the grounds that petitioner lacked standing. The opinion went on to note:

Mr. Justice Douglas would deny certiorari on the grounds that petitioner, who was convicted of performing an abortion, is not a doctor and that the decisions of this Court in Roe v. Wade, 410 U. S. 113, 93 S. Ct. 705, 35 L. Ed. 2d 147 and Doe v. Bolton, 410 U. S. 179, 93 S. Ct. 739, 35 L. Ed. 2d 201 were confined to the condition: inter alia, that the abortion, if performed, be based on an appropriately safeguarded medical judgment. [410 *U. S.* at 991, 93 S. Ct. 1516].

(1951). *See generally* Note, 109 *U. Pa. L. Rev.* 67 (1960). Moreover, in *Lanzetta, supra,* the Court pointed out that an individual may not be required to speculate "at peril of life, liberty or property" about the meaning of penal statutes, 306 *U. S.* at 453, 59 S. Ct. at 618. Finally, *Harriss, supra,* makes it clear that the requirement for definiteness in criminal statutes is violated if it "fails to give a person of ordinary intelligence fair notice that his contemplated action is forbidden." 347 *U. S.* at 617, 74 S. Ct. at 812.

With these general principles in mind, we consider the vagueness argument in the context of the facts presented. In resolving this aspect of the case, we follow the approach of the United States Supreme Court in *United States v. National Dairy Products Corp.,* 372 *U. S.* 29, 83 S. Ct. 594, 9 L. Ed. 2d 561 (1963), a criminal prosecution under section 3 of the Robinson-Patman Act in which the district court dismissed the indictment on vagueness grounds. In reversing the dismissal, the Court declined to consider the vagueness issue in the abstract but rather focused its attention on the conduct of the defendant:

In determining the sufficiency of the notice a statute must of necessity be examined in the light of the conduct with which a defendant is charged. [372 *U. S.* at 33, 83 S. Ct. at 598].

We have previously considered and rejected the argument that *N. J. S. A.* 2A:87–1 is impermissibly vague in the context of criminal convictions for conspiracy to commit an unlawful abortion. In *State v. Moretti,* 52 *N. J.* 182 (1968), *cert.* den., 393 *U. S.* 952, 89 S. Ct. 376, 21 L. Ed. 2d 363 (1968), the defendants arranged to have an abortion performed by a layman upon an undercover investigator of the Essex County Prosecutor's Office. 52 *N. J.* at 185. In affirming the defendants' convictions,[14] we invoked *National*

---

[14] Only two of the defendants appealed. The layman who was to perform the abortion died shortly after trial. 52 *N. J.* at 185.

*Dairy Products, supra,* and analyzed the defendants' vagueness argument from the perspective of the conduct for which they were convicted:

The only inquiry before us is whether *these* defendants had sufficient warning that their conduct was criminal. * * * Thus, a defendant whose conduct was such that he clearly could tell that it was prohibited will not be heard to say that the statute is overly broad and that another, in some hypothetical case, could be misled. [52 *N. J.* at 192 (emphasis in original)].

Applying that approach to the facts of the case, we concluded that the defendants "could not fail to be aware that the abortion they conspired to commit would violate the statute." 52 *N. J.* at 193–94. *See also United States v. Raines,* 362 *U. S.* 17, 21, 80 S. Ct. 519, 4 L. Ed. 2d 524 (1960); *State v. Young,* 57 *N. J.* 240, 253–54 (1970), *cert.* den., 402 *U. S.* 929, 91 S. Ct. 1527, 28 L. Ed. 2d 863 (1971) (addressing the issue in terms of standing).

We continue to adhere to the approach of *Moretti, supra.* We need not consider the vagueness issue in the abstract, or for purposes of this case pass on the meaning of "lawful justification" in the context of hypothetical factual situations. This defendant could not possibly be unaware that the term "without lawful justification," as used in *N. J. S. A.* 2A:87–1, at the very least means that an abortion must be performed by a licensed physician in the exercise of his medical judgment. Consequently, it is clear that it was not error for the trial court to exclude defendant's attempt to introduce evidence of justification for the instant abortion.

## C

We also reject defendant's contention that *N. J. S. A.* 2A:87–1 cannot be invoked to prosecute her by reason of *Y. W. C. A. v. Kugler, supra.* In *Kugler,* a three-judge district court granted a motion for summary judg-

ment declaring *N. J. S. A.* 2A:87–1 unconstitutional on vagueness and privacy grounds. On appeal, however, The Third Circuit vacated and remanded the case without published opinion, 475 *F.* 2d 1398 (3 Cir. 1973). On remand, the district court reconsidered its decision in light of *Roe* and *Doe,* and reaffirmed its prior decision in an unpublished opinion and order, Civil No. 264–70 (D. N. J. July 24, 1973). The case was again appealed, and on March 7, 1974 the Third Circuit affirmed the July 24, 1973 order of the district court without opinion, 493 *F.* 2d 1402 (3 Cir. 1974). The United States Supreme Court subsequently denied *certiorari,* 415 *U. S.* 989, 94 S. Ct. 1587, 39 L. Ed. 2d 885 (1974).

Of course, elementary considerations of judicial comity require us to give due respect to the decisions of the lower federal courts, particularly on questions involving the federal constitution. However, as we pointed out in *State v. Coleman,* 46 *N. J.* 16 (1965), *cert.* den., 383 *U. S.* 950, 86 S. Ct. 1210, 16 L. Ed. 2d 212 (1966), even with respect to federal constitutional issues, the state courts and lower federal courts occupy comparable positions:

In passing on federal constitutional questions, the state courts and the lower federal courts have the same responsibility and occupy the same position; there is parallelism but not paramountcy for both sets of courts are governed by the same reviewing authority of the Supreme Court. [46 *N. J.* at 36].

*See also State v. Shapiro,* 122 *N. J. Super.* 409, 436 (Law Div. 1973); *State v. Zito,* 103 *N. J. Super.* 552, 557 (App. Div. 1968), aff'd 54 *N. J.* 206 (1969); *State v. Speciale,* 96 *N. J. Super.* 1, 7 (App. Div. 1967), certif. den., 50 *N. J.* 291 (1967).[15]

---

[15]The United States Supreme Court has recently indicated that a federal declaratory judgment that a state statute is unconstitutional does not necessarily foreclose all state prosecutions, at least where the statute is declared invalid on vagueness or overbreadth grounds:

We have considered *Kugler, supra,* but for the reasons we have previously developed in parts IA and B of this opinion, we decline to follow it.[16] Accordingly, we reject defendant's argument that no conviction can be sustained pursuant to *N. J. S. A.* 2A:87-1 in light of that decision.

## II

We also conclude that defendant's conviction for contributing to the delinquency of a child, in violation of *N. J. S. A.* 2A:96-4,[17] must be affirmed, despite her ar-

---

Thus, where the highest court of a State has had an opportunity to give a statute regulating expression a narrowing or clarifying construction but has failed to do so, and later a federal court declares the statute unconstitutionally vague or overbroad, it may well be open to a state prosecutor, after the federal court decision, to bring a prosecution under the statute if he reasonably believes that the defendant's conduct is not constitutionally protected and that the state courts may give the statute a construction so as to yield a constitutionally valid conviction. [*Steffel v. Thompson,* 415 U. S. 451, 470, 94 S. Ct. 1209, 1221, 39 L. Ed. 2d 505 (1974) (quoting from *Perez v. Ledesma,* 401 U. S. 82, 125, 91 S. Ct. 674, 27 L. Ed. 2d 701 (1971) (Brennan, J. joined by White and Marshall JJ., concurring in part and dissenting in part))]

[16]It should also be noted that in the *Kugler* litigation, the New Jersey attorney general moved before the Third Circuit for a stay of the declaratory judgment shortly after the three-judge district court rendered its decision. *Y. W. C. A. v. Kugler,* 463 *F.* 2d 203 (3 Cir. 1972). In denying the motion the court pointed out that *Kugler* was not a class action and that:

In the absence of a class action determination the declaratory judgment is binding only between these seven individual physician plaintiffs and the defendant appellant. Between the State of New Jersey and any other persons the opinion of the three-judge district court has only stare decisis effect to be weighed against conflicting opinions in the New Jersey Courts. The State remains free to take whatever steps against others than the individual plaintiffs it deems appropriate to enforce the statute by criminal sanctions. It is clear from the carefully considered and limited relief afforded by the district court that this is exactly the position in which it intended to leave the State. [463 *F.* 2d at 204].

[17]*N. J. S. A.* 2A:96-4 provides:

A parent, legal guardian or person having the custody or control of a child, who by any continued negligence or willful act, encour-

gument that submitting to an abortion is neither illegal, see *In re Vince*, 2 *N. J.* 443, 450 (1949), nor immoral.

In our view, *State v. Blount*, 60 *N. J.* 23 (1972) disposes of defendant's contention that her conviction on this count was improper. In *Blount* the Appellate Division reversed a conviction under *N. J. S. A.* 2A:96–4 because in its view, defendant's conduct did not result in the victim's becoming delinquent. *State v. Blount*, 114 *N. J. Super.* 211 (App. Div. 1971). We granted the State's petition for certification, 58 *N. J.* 597 (1971), and reversed the Appellate Division, reinstating defendant's conviction.

Our approach in *Blount*, buttressed by the legislative history of the statute, was based on the recognition that the section "was intended to prevent the exposure of a child to the danger of leading an immoral life." 60 *N. J.* at 28. Since the Legislature was concerned with preventing acts having the potential to cause delinquency as well as those which actually cause the child to become delinquent,[18] we construed *N. J. S. A.* 2A:96–4

> to require only that the defendant's actions have a tendency to cause rather than result in a child's delinquency. It is true that the terms "causes" and "contributes," as used in the statute, apply only to cases where the child has become a delinquent because of the defendant's conduct or is a delinquent at the time of such conduct. However, the term "encourages" in the statute covers a case where the defendant's conduct has a tendency to cause delinquency whether or not delinquency in fact ensues. [60 *N. J.* at 27 (footnote omitted)].

Although *Blount* raised the issue as a question of first impression before this Court, our belief that *N. J. S. A.* 2A:

---

ages, causes or contributes to the child's delinquency, or any other person who by any willful act encourages, causes or contributes to a child's delinquency, is guilty of a misdemeanor.

[18]At the time that the instant abortion was performed, *N. J. S. A.* 2A:4–14(2) g and m defined juvenile delinquency as "immorality" or "deportment endangering the morals, health or general welfare of said child." Effective March 1, 1974, however, the definition of delinquency was substantially restricted by the enactment of *L.* 1973, c. 306, *N. J. S. A.* 2A:4–44 (Supp. 1975–76).

96–4 does not require an actual finding of delinquency is shared by most courts which have considered the problem under similar statutes, *see generally,* Annotation "Criminal liability for contributing to delinquency of minor as affected by the fact that minor has not become a delinquent," 18 *A. L. R.* 3d 824, 827 (1968), and cases collected therein.

Examination of the evidence adduced in the present case in light of *Blount, supra,* satisfies us that the jury could reasonably have found that defendant's conduct had the tendency to cause the witness's delinquency. Since the trial court's instructions to the jury were wholly consistent with both *Blount* and the statutory definition of delinquency,[19] it follows that defendant's conviction on this count of the indictment must be affirmed. In holding that this defendant was properly convicted under *N. J. S. A.* 2A:96–4, we do not wish to be understood to mean that any abortion performed on a minor will be sufficient to establish criminal liability under the statute. A holding of such breadth is unnecessary, unwise and would raise serious constitutional questions under *Roe* and *Doe, supra.* What we do mean is that the evidence disclosed by this record, that is the solicitation and performance of an abortion upon a minor by a layman totally without medical training or experience, raised a fact issue which the jury could reasonably resolve by finding that defendant's conduct tended to cause delinquency as that term was defined by existing statutes. *See* n. 18, *supra.*

---

[19]In charging the jury on this count, the court said:

The State must also prove that the willful act or conduct of the defendant encouraged or had a tendency to cause the child's becoming delinquent. It is not necessary for the State to prove that the defendant's conduct actually resulted in the child becoming delinquent.

A delinquent child is one who engaged in an illegal or immoral act. that is, an act which is of itself in violation of law or which is not consistent with good morals * * *

## III

Relying principally on her record of community service, defendant argues that her sentence is excessive. We disagree. The sentence imposed by the trial court is well below the maximum permitted by the Legislature. Of course, that fact alone does not end our inquiry, *State v. Bess,* 53 *N. J.* 10, 18 (1968); *State v. Laws,* 51 *N. J.* 494, 498–501 (1968), *cert.* den., 393 *U. S.* 971, 89 S. Ct. 408, 21 L. Ed. 2d 384 (1968), but before we interfere with a sentence there must be "a clear showing of abuse of discretion." *State v. Tyson,* 43 *N. J.* 411, 417 (1964), *cert.* den., 380 *U. S.* 987, 85 S. Ct. 1359, 14 L. Ed. 2d 279 (1965), *State v. Benes,* 16 *N. J.* 389, 396 (1954); *State v. Provoid,* 110 *N. J. Super.* 547, 559 (App. Div. 1970). *See also State v. Souss,* 65 *N. J.* 453 (1974).

The present record discloses no such abuse; to the contrary, it is clear that in imposing a custodial sentence on defendant, the trial court carefully considered all relevant circumstances, including the nature of the offense, defendant's prior conviction for obtaining property by false pretenses and sentence, as well as the many letters submitted on behalf of defendant stressing her community work. Our evaluation of all the factors disclosed by this record satisfies us that the sentence imposed by the trial court was entirely proper and indeed best serves the ends of justice in this case. Accordingly, we decline to modify defendant's sentence.

Affirmed.

*For affirmance*—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD and SCHREIBER and Judge CONFORD—7.

*For reversal*—None.