# Proposed Federal Abortion Legislation

The proposed legislation would enact a federal statutory regime of abortion regulation that leaves the States with substantially less regulatory authority than they have under *Roe v. Wade* or *Planned Parenthood v. Casey.*

The proposed legislation would represent a doubtful exercise of Congress' power to enforce the Fourteenth Amendment and would rest on a questionable link to Congress' power to regulate interstate commerce.

July 1, 1992

LETTER FOR THE CHAIRMAN
COMMITTEE ON LABOR AND HUMAN RESOURCES
U.S. SENATE

This letter presents the views of the Department of Justice concerning the amended versions of the Freedom of Choice Act of 1991, introduced as companion bills H.R. 25 and S. 25 (collectively "the bill"). The Department strongly opposes enactment of this legislation. The recent amendment introduced by Senator Mitchell, making minor changes to the bill, fails to confront the bill's most serious flaws. For the reasons below, if the bill were presented to the President, I and the President's other senior advisors would recommend that he veto this legislation.

The review bill would still prohibit States from enacting reasonable regulatory restrictions on abortions clearly permitted under *Roe v. Wade* and its progeny. It would also represent a doubtful exercise of Congress' power under the Fourteenth Amendment and would rest on a questionable link to Congress' power to regulate interstate commerce.

## I. The Revised Bill

The bill is described by its sponsors as a "codification" of much of the complex regime of abortion legislation erected by the Supreme Court since its 1973 decision in *Roe v. Wade*, 410 U.S. 113 (1973). The bill as revised expressly states its purpose to be "to achieve the same limitations as provided, as a constitutional matter, under the strict scrutiny standard of review enunciated in *Roe v. Wade* and applied in subsequent cases from 1973 to 1988." Section 2(b). Because of its sweeping language, however, the bill

1

would enact a federal statutory regime of abortion regulation that leaves the states with substantially less regulatory authority than under *Roe* or the Supreme Court's decision earlier this week in *Planned Parenthood v. Casey*, 505 U.S. 833 (1992).

The essence of the bill remains substantially unchanged: "[a] State . . . may not restrict the freedom of a woman to choose whether or not to terminate a pregnancy before fetal viability," and after viability the State may not restrict abortion if the abortion "is necessary to preserve the life or health of the woman." Section 3(a)(1) and (2).

The revised bill would thus still allow abortions for any reason, even sex selection, before the fetus becomes "viable." With no definition or standards for viability, it appears that the bill could leave that determination to the person performing the abortion. Thus a single health care professional's judgment that a particular fetus was not "viable" would be conclusive and binding on the state, whether or not the fetus satisfied other objective criteria of "viability" such as a test for weight. It is not even clear that the professional judgment must be rendered by a medical doctor.

Even after fetal viability, with no standards for determining what constitutes the "health of the woman" justifying an abortion, the revised bill would still go well beyond merely "codifying" *Roe*. As we have explained in earlier statements and testimony, we believe that the term "health" in section 3(a)(2) would likely be construed broadly. *See Doe v. Bolton*, 410 U.S. 179 (1973). The Court there noted that the medical judgment must be made in light of all factors, including "emotional, psychological, [and] familial" factors. *Id.* at 192. It is likely, therefore, that even after viability an abortion performed for any reason that a medical professional (who, again, apparently need not be a licensed physician) deemed "relevant to the well-being" of the woman, *id.*, would probably be protected under the bill as "necessary to preserve the life or health of the woman." Section 3(a)(2).

The revised bill purports to address a few of the concerns the Department has raised previously. These changes, however, do not fully meet the Department's concerns on the issues they address, and leave many more serious flaws unaddressed.

For example, the revised bill allows some degree of parental participation in the decision of a minor to undergo an abortion. However, it provides only that the state could require the minor to "involve" the parent in the decision. Section 3(b)(3). The term "involve" is left undefined. It is troubling that the bill's authors chose an inherently vague term over more definite words such as "notify" and "consent." It is simply unclear whether the bill would exclude parental consent requirements. The bill could thus be read to invalidate laws in the twenty-one states that require some form of parental consent, including the Pennsylvania abortion statute upheld this week by the Supreme Court in *Casey*.

So read, the bill would go well beyond *Roe* and later cases. In *Bellotti v. Baird*, 443 U.S. 622, 647 (1979), for example, a plurality of the Court ruled

that a parental consent requirement for abortions by minors would be constitutional if it contained a judicial bypass provision. And in *Planned Parenthood Association v. Ashcroft*, 462 U.S. 476, 493-94 (1983), the Court upheld another parental consent provision with a judicial bypass. The bill could be read to overrule these cases to the extent they permitted such consent provisions. The bill would not, therefore, codify *Roe* as "applied in subsequent cases from 1973 to 1988," as it claims to do. Section 2(b).

Although the revised bill would permit States to protect the rights of unwilling individuals to refrain from performing abortions, the bill does not permit *institutions* to refuse to perform abortions. Thus, a hospital whose board or sponsoring organization was opposed to abortions could nevertheless be held liable for refusing to perform them. Indeed, the bill could now be read to require institutions to hire willing individuals in order to provide abortion services. Similarly, although the Senate bill has been amended to allow a state to refuse to pay for abortions, section 3(b)(2), nothing in that provision or any other part of the bill appears to permit a state to deny the use of a state facility to a woman who was willing to pay for the abortion. The bill might even be construed to *require* the states to provide state facilities for abortions where private facilities are unavailable.

Further, the revised bill contains no exception for informed consent and waiting periods. State laws requiring that factual information concerning the nature of the abortion procedure and available alternatives be made available to a woman twenty-four or forty-eight hours prior to an abortion would thus be invalidated. Thirty-two states currently have such laws. The purpose of such provisions is typically to ensure that the woman's decision to abort is free, reflective and informed. That state purpose would be illegitimate under the bill.

## II. Congressional Authority

The bill has been significantly revised to address the Congress' power to adopt it. The bill asserts that Congress has the authority to enact the bill under both the Commerce Clause (Article I, Section 8) and Section 5 of the Fourteenth Amendment of the Constitution. *See* section 2(a)(4). We continue to doubt whether Congress has authority to enact this legislation on the proffered grounds.

In commenting on earlier versions of this legislation, we criticized the suggested reliance on Congress' power under Section 5 of the Fourteenth Amendment, arguing that the Section 5 authority does not extend to fixing the content of the amendment's substantive provisions. We are therefore pleased that the bill now acknowledges that "Congress may not by legislation create constitutional rights" and purports to create only "statutory rights." Section 2(a)(3).

Having recognized that Congress may not create constitutional rights or

3

alter their content, the bill's drafters have now sought to assert a connection between recognized constitutional rights and the statutory right to abortion that the bill would adopt. That assertion, however, is unpersuasive.

For example, the bill suggests that the statutory rights it creates would protect "liberty." Section 2(a)(4). The Fourteenth Amendment, however, prohibits only certain deprivations of liberty, for instance those that have no rational relationship with a legitimate state interest; were it to prohibit all deprivations of liberty, it would forbid an enormous range of laws including laws against homicide. Thus, to say that a proposed federal statute prevents the states from restricting liberty in general is to say almost nothing about whether the federal statute in any way implements the commands of the Fourteenth Amendment. The bill also asserts that state restrictions on abortion interfere with women's exercise of constitutional rights unrelated to abortion. Section 2(a)(2)(D). The bill does not say what these other rights are, so it is impossible to tell how it would keep the states from interfering with them.

As we have noted with respect to earlier versions of this legislation, Congress' power under the Commerce Clause has been held to be quite broad. It is likely that Congress could enact some legislation concerning abortion pursuant to that power. The arguments now put forward to support this legislation under the Commerce Clause, however, are still troublesome. For example, the bill finds that restrictions on abortion "burden interstate commerce by forcing women to travel from States in which legal barriers render contraception or abortion unavailable or unsafe to other States or foreign nations." Section 2(a)(2)(A)(ii). We fail to see how any increased interstate travel resulting from diverse state laws regulating abortion would constitute a burden on commerce. Moreover, the argument that travel from one jurisdiction to another justifies a single national abortion law on commerce grounds proves too much, for it could justify uniform federal laws on any subject, which is inconsistent with the notion of the federal government as a government of limited powers.

Finally, in our view Congress' intervention in this area would usurp a field of legislation traditionally reserved to the states. As must be obvious from the public reaction this week to the Supreme Court's *Casey* decision, the policy choices in this area are difficult and national consensus is elusive. The political outcomes of fifty distinct state processes would be far more likely to represent the genuine diversity of views that exists on this subject than would a uniform federal code entrenching a more restrictive regime than that of *Roe* and *Casey*. Observance of federalism is thus particularly desirable with respect to abortion regulation.

In keeping with the President's position that "[a]s a nation, we must protect the unborn," Message to the House of Representatives Returning Without Approval the District of Columbia Appropriations Act, 1990, 2 Pub. Papers of George Bush 1563 (Nov. 20, 1989), and for the reasons explained above, the Department of Justice opposes the enactment of the bill, and if

4

the bill were presented to the President in its current form, I and the President's other senior advisors would recommend a veto.

Sincerely,

WILLIAM P. BARR
*Attorney General*