REQUESTED BY: Senator Jim Jensen
You have requested an Attorney General's Opinion as to "whether a ban on `partial-birth abortions in the State of Nebraska would be constitutional."
I. Applicable Law
In Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705
(1973), the United States Supreme Court declared that "the unborn" are not persons, and announced a new fundamental constitutional right to abortion which prevents States from outlawing abortion before viability of the child.410 U.S. at 147-165, 93 S.Ct. at 724-733. Roe established a "trimester" framework governing state regulation of abortion. Under Roe, virtually no restrictions could be placed on first trimester abortions. After viability, though, the States could outlaw abortion except where necessary to preserve the life or "health" of the mother. Id. at 163-165,93 S.Ct. at 732-733. The actual ability of States to prohibit abortions after viability was illusory, however, since the "health" exception swallowed the rule. In the companion case ofDoe v. Bolton, 410 U.S. 179, 93 S.Ct. 739 (1973), the Court defined "health" as including psychological, emotional, and familial factors (such as depression, youth, anxiety) as well as physical factors. Id. at 192, 93 S.Ct. at 747. Consequently, for all practical purposes, the termination of all pregnancies was a legally protected constitutional right for virtually any reason up until the birth of the child. In fact, in Schulte v. Douglas, 567 F. Supp. 522 (D.Neb. 1981), aff'd per curiam sub nom. Womens Services, P.C. v.Douglas, 710 F.2d 465 (8th Cir. 1983), the Federal District Court for the District of Nebraska invalidated a Nebraska statute which attempted to prohibit abortion after viability of the child even though the statute allowed post-viability abortions that were "necessary to preserve the woman from an imminent peril that substantially endangers her life and health."
Although Roe v. Wade has never been overruled, in 1992 the U.S. Supreme Court discarded its arbitrary "trimester" framework, and placed greater emphasis on the States' interest in "potential" life throughout pregnancy. In PlannedParenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833,112 S.Ct. 2791 (1992), the Court held that States could regulate pre-viability abortions as long as the regulation did not impose an "undue burden" on the woman. A state statute regulating abortion must have neither "the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." Planned Parenthood v.Casey, 112 S.Ct. at 2820-21. Casey also lowered the judicial standard applied to state abortion statutes. "After Casey, the State need only show that it has a legitimate interest, and that the challenged regulation `cannot be said [to] serve no purpose other than to make abortions more difficult.'" Women's Medical Professional Corp. v.Voinovich, 911 F. Supp. 1051, 1074 n. 30 (S.D. Ohio 1995).
The Court clearly stated in Casey that after the unborn child reaches viability the State's interest in protecting the fetus outweighs the woman's liberty interest in having an abortion, subject only to a medical determination that an abortion is necessary for the preservation of the life or health of the mother. 112 S.Ct. at 2816-17, 2819-2821. Consequently, "regulations which apply only to post-viability abortions are presumptively valid, unless they have an adverse impact on the life or health of the pregnant woman." Women's MedicalProfessional Corp. v. Voinovich, 911 F. Supp. at 1060.
Most significantly perhaps, the Court in Casey
upheld a definition of "medical emergency" in a Pennsylvania statute which limited the physician's determination to consideration of physical health factors. 112 S.Ct. at 2822. The Supreme Court further stated, albeit in dicta, that it is only in "rare circumstances in which the pregnancy is itself a danger to [the woman's] own life or health." 112 S.Ct. at 2806. If the Supreme Court meant what it said in Casey, then laws prohibiting post-viability abortions except where necessary to preserve the life and physical health of the mother are constitutional. If on the other hand, "health" is still an all-inclusive term, the Supreme Court's statements are mere legal sophistry, serving only to obscure the fact that babies' brains may still legally be suctioned out of their heads (as in partial-birth abortions) for virtually any reason. In fact, a federal district court recently held that "a state may not constitutionally limit the provision of abortion only to those situations in which a pregnant woman's physical health is threatened, because this impermissibly limits the physician's discretion to determine what measures are necessary to preserve her health." Women's Medical, 911 F. Supp. at 1081. Consequently, it is not clear whether "health" may be limited to physical factors. If not, the ability of States to proscribe abortions even after viability remains as illusory today as it was between 1973 and 1992. Nonetheless, the State of Nebraska is legally entitled to rely on the Casey decision until and unless a court of competent jurisdiction directs otherwise.
In sum, a total ban on "partial-birth abortions", especially since it would encompass both pre-viability and post-viability abortions, would likely have to pass the "undue burden" test ofCasey.[1] Under Casey, "a state may act to prohibit a method of abortion, if there are safe and available alternatives." Women's Medical,911 F. Supp. at 1067. In Women's Medical, the court framed the issue as "whether . . . there are safe and available alternatives to the D X procedure, which is typically performed during the twentieth to twenty-fourth weeks of pregnancy, such that there would be no undue burden if the procedure were banned."Id.[2]
 II. Analysis
Because the answer to your question ultimately hinges on medical facts (i.e. whether there are "safe" and available alternatives to the partial-birth or D X abortion procedure), it is essential to define the procedure and its alternatives. This opinion will not attempt to define all the available alternatives, but will discuss several relevant procedures.
A. Definition of Abortion Procedures
 1. Partial-birth/D X Abortions
The procedure referred to in your request ("partial-birth abortion") is also sometimes known as a "Dilation and Extraction" ("D X") abortion. See Women's Medical,911 F. Supp. at 1063; Family Planning Specialists v. Powers,46 Cal.Rptr.2d 667, 668 (Cal.App. 1995). This procedure involves partial dilation of the woman's cervix; pulling the baby's feet and entire body out through the birth canal up to the baby's neck; piercing the baby's skull with a sharp instrument; insertion of a tube into the brain; removal of the brain by suction; collapse of the skull; and removal of head. The baby (usually 20-24 weeks old) may or may not be alive and kicking at the time his or her skull is pierced and brains are suctioned out.[3]
 a. Haskell D X
The best-known practitioner of this procedure is Dr. Martin Haskell. His D X abortion procedure has been described as follows:
 On the first and second days of the procedure, Dr. Haskell inserts dilators into the patient's cervix. On the third day, the dilators are removed and the patient's membranes are ruptured. Then, with the guidance of ultrasound, Haskell inserts forceps into the uterus, grasps a lower extremity [foot and leg], and pulls it into the vagina. With his fingers, Haskell then delivers the other lower extremity [foot and leg], the torso, shoulders, and the upper extremities [arms]. The skull, which is too big to be delivered, lodges in the internal cervical os. Haskell uses his fingers to push the anterior cervical lip out of the way, then presses a pair of scissors against the base of the fetal skull. He then forces the scissors into the base of the skull, spreads them to enlarge the opening, removes the scissors, inserts a suction catheter, and evacuates the skull contents [brain]. With the head decompressed, he then removes the fetus completely from the patient.
Women's Medical, 911 F. Supp. at 1066 (bracketed material added). Dr. Haskell has stated that about 80% of the D X abortions he performs between 20 and 24 weeks "are purely elective." See Hearings on H.R. 1833 Before the Senate Judiciary Committee, 104th Cong., 1st Sess (Nov. 17, 1995) Transcript at p. 13.[4]
 b. Ohio Statutory Definition
In the State of Ohio, Dilation and Extraction abortion (D 
X or partial-birth abortion) has been statutorily defined at follows:
 [T]he termination of a human pregnancy by purposely inserting a suction device into the skull of a fetus to remove the brain. `Dilation and extraction procedure' does not include either the suction curettage procedure of abortion or the suction aspiration procedure of abortion.
O.R.C. § 2919.15(A) (The Ohio statute bans this procedure except where "all other available abortion procedures would pose a greater risk to the health of the pregnant women.").
c. Congressional Definition
The United States Congress defined partial-birth abortion as follows:
 "partial-birth abortion" means an abortion in which the person performing the abortion partially vaginally delivers a living fetus before killing the fetus and completing the delivery. The Congressional bill excepted partial-birth abortions "necessary to save the life of a mother whose life is endangered by a physical disorder, illness or injury: Provided, that no other medical procedure would suffice for that purpose.
Partial Birth Abortion Ban Act of 1995 (H.R. 1833, as amended by the Senate Amendments. Congressional Record H 11604 (Nov. 1, 1995) and H 2905 (March 27, 1996)). See also Sabelko v.City of Phoenix, 68 F.3d 1169, 1174 n. 1 (referencing Senate debate) ("the abortionist takes a pair of scissors and inserts the scissors into the back of the skull and then opens the scissors up to make a gap in the back of the skull in order to insert a catheter to literally suck the brains from the back of that child's head. That is what happens in the so-called partial-birth abortion.").
2. Dilation Evacuation Abortions
Another type of abortion is known as dilation and evacuation or D E. See Women's Medical, 911 F. Supp. at 1064. This procedure was described in that case in some detail by the United States District Court for the Southern District of Ohio as follows:
 In the second trimester, the fetus becomes too large to remove by use of suction curettage. At that point, the most common abortion method is a Dilation and Evacuation (D E) procedure; indeed, it is the only procedure which can be used from the thirteenth to sixteenth weeks of pregnancy. Instead of using metal rods to dilate the cervix over a short period of time, the doctor inserts laminaria into the cervix during the one-to-two day period prior to the procedure, in order to slowly dilate the cervix. Then, a suction curette with a larger diameter is placed through the cervix, and the doctor removes some, or all, of the fetal tissue.
 Frequently, however, the torso and the head cannot be removed in this manner. The procedure typically results, therefore, in a dismemberment of the fetus, beginning with the extremities. This dismemberment is accomplished both by use of the suction curettage, and by the use of forceps [the arms and legs are cut off or pulled off].
 Removing the head of the fetus from the uterus is typically the most difficult part of the D E procedure, in part because the head is often too large to fit through the partially dilated cervix. It is important to remove the head as quickly as possible, because fetal neurologic tissue can negatively affect the mother's ability to clot, and lead to greater bleeding. Physicians have developed different methods of decompressing the head, in order to remove it.
 Dr. Anthony Levatino testified that when he performed D E abortions, he preferred to grasp the fetal head with a clamp, crush it, and remove it in pieces along with the skull contents. Because he decompressed the skull by crushing it, he found it unnecessary to decompress the skull by purposely inserting a suction device into the skull and removing some of its contents.
 Dr. Paula Hillard testified that when the skull is too large to remove intact, she grasps the skull and suctions out its contents with a cannula — which may enter the skull — in order to decompress it and facilitate its removal. . . .
 Dr. Doe Number One testified that because the use of forceps can cause trauma to the mother's uterus, his preference is to collapse the head by use of suction, prior to its removal. By making a small incision at the base of the skull and inserting a suction device into the brain — while the head is still within the uterus, and no longer attached to the body — he can collapse the head and easily remove it, without the use of forceps. This method decreases injury to the cervix and uterus, and reduces operating room time, blood loss, and anesthesia time. Dr. Doe describes his procedure as a D E, and collapses the head by the use of suction even in procedures performed from 15 to 18 weeks. . . .
 Dr. Mary Campbell has not performed second-trimester abortions, but has read about and observed various second-trimester methods, in preparation for setting up a second-trimester practice at her clinic. In describing the D E procedure, she testified that the fetal skull is generally not intact following dismemberment of the body — the jaw is often removed with the neck — and "the edges of the fetal skull are sharp enough to lacerate the maternal uterine [blood] vessels. . . ." The goal is therefore to place the suction cannula into the skull in order to remove its contents and make it smaller, thereby allowing it to be removed intact, in order to minimize lacerations. In addition, removing the head intact is advantageous because it ensures that no parts of the skull are left behind in the woman's uterus.
. . .
 The primary distinction between this D X procedure and the D E procedure previously described appears to be that, whereas the D E procedure results in dismemberment and piece-by-piece removal of the fetus from the uterus — and, possibly, in removal of portions of the skull contents by the use of suction after the skull is crushed with forceps or otherwise invaded, and before the head is placed next to the opening to the uterus — the D X procedure results in a fetus which is removed basically intact except for portions of the skull contents, which are suctioned out after the head is placed next to the opening to the uterus (and after the rest of the fetus is removed from the uterus), and before the fetus is fully removed from the mother's body.
The hallmark of the D X procedure, therefore, is that the fetus is removed intact, rather than being dismembered prior to removal, as is done in a D E procedure. In both procedures, the head usually must be decompressed, either by crushing the skull, or by invading the skull and suctioning out its contents. In the D X procedure, the suctioning is purposeful; in a D E procedure, the suction may either be purposeful, or, given the inability to clearly see the fetus, even with ultrasound, and the consequent difficulty of knowing whether the surgical instrument is in, or simply near, the skull, it may be accidental.
Women's Medical, 911 F. Supp. at 1064-66 (emphasis and bracketed material added).
The court in Women's Medical concluded that "Assuming that the D X procedure is `cruel,' however, this Court fails to see how it is more cruel than the D E procedure — which involves the dismemberment of the fetus and, sometimes, the crushing of its skull. . . ."911 F. Supp. at 1074 n. 29. The D E abortion procedure is the most common abortion procedure in the second trimester (after 13 weeks).
3. Instillation/Induction Procedures
The court, in Women's Medical, also described a procedure known as instillation/induction.
 The main alternative to the D X procedure, in the late second trimester, is the use of an induction method of abortion. Induction methods are also known as "instillation" methods. In one type of induction method, the physician injects some substance — typically saline, or a combination of a prostaglandin and urea — into the amniotic cavity of the woman. In another type, the physician places prostaglandin suppositories into the patient's vagina. In both cases, the end result is labor: the substances cause the uterus to contract, resulting in the eventual expulsion of the fetus. This labor typically lasts between twelve and twenty-four hours, but may last as long as thirty-six hours.
Id. at 1068.
B. Availability of Other Procedures
Under the undue burden test in Casey, in order for a statute banning partial-birth abortions to be upheld it is necessary to show that there are "safe" alternative abortion procedures available. Women's Medical,911 F. Supp. at 1067. The court in Women's Medical concluded there are not:
 After viewing all of the evidence, and hearing all of the testimony, this Court finds that use of the D X procedure in the late second trimester appears to pose less of a risk to maternal health than does the D E procedure, because it is less invasive — that is, it does not require sharp instruments to be inserted into the uterus with the same frequency or extent — and does not pose the same degree of risk of uterine and cervical lacerations, due to the reduced use of forceps in the uterus, and due to the removal of any need to crush the skull and remove it in pieces, which can injure maternal tissue.
 This Court also finds that the D X procedure appears to pose less of a risk to maternal health than the use of induction procedures, which require the woman to go through labor, pose additional risks resulting from the injection of fluids into the mother, and cannot be used for every woman needing an abortion.
 Finally, the Court finds that the D X procedure appears to pose less of a risk to maternal health than either a hysterotomy or a hysterectomy, both of which are major, traumatic surgeries.
 Because the D X procedure appears to have the potential of being a safer procedure than all other available abortion procedures, this Court holds that the Plaintiff has demonstrated a substantial likelihood of success of showing that the state is not constitutionally permitted to ban the procedure. If this abortion procedure, which appears to pose less of a risk to maternal health than any other alternative, were banned, and women were forced to use riskier and more deleterious abortion procedures, the ban could have the effect of placing a substantial obstacle in the path of women seeking pre-viability abortions, which would be an undue burden and this unconstitutional under Casey.
 Even if induction procedures were as safe as the D X procedure — and this Court does not find, on the evidence, that they are as safe — the requirement that a pregnant woman be hospitalized in order to undergo an induction procedure may also have a negative impact on the practical availability of abortions for women seeking pre-viability abortions. First, hospitals may refuse to allow induction procedures on an elective basis, including those situations in which a woman wishes to abort a fetus with severe anomalies. Second, it may be psychologically daunting to undergo the induction procedure in the hospital environment. These practical problems may discourage women in their second trimester from exercising their right of seeking elective, pre-viability abortions, or make it practically impossible to do so, thereby amounting to an undue burden on the right to seek a pre-viability abortion. In contrast, the D X procedure can be performed on an outpatient basis within a much shorter period of time, and is not limited by either of these practical problems.
 For both of these reasons — because the D X procedure appears to be the safest method of terminating a pregnancy in the late second trimester, and because the D X procedure is more available than induction methods, which require the woman to be hospitalized — this Court holds that Plaintiff has demonstrated a substantial likelihood of success of showing that the ban on the D X procedure is unconstitutional under Danforth and Casey.
Id. at 1070-1071.
As is evident from the above-quoted portions of the opinion, the court in Women's Medical refused to give legal significance to the fact that under the Ohio statute, the D X or partial-birth abortion procedure is not prohibited where "all other available abortion procedures would pose a greater risk to the health of the pregnant woman than the risk posed by the dilation and extraction procedure." See
O.R.C. 2919.15(C)(1). This point will likely be argued by the State of Ohio on appeal, as Women's Medical is now before the 6th Circuit Court of Appeals (We have obtained and reviewed the briefs from that appeal in preparing this opinion).
Although the findings of the District Court for the Southern District of Ohio are, apparently, the only judicial findings currently available, they are not controlling on Nebraska courts or even necessarily persuasive. We have also reviewed testimony provided to the Congress of the United States by medical experts.
During the U.S. Senate's consideration of H.R. 1833 last November, Nancy G. Romer, M.D. testified before the Senate Judiciary Committee on the medical aspects of partial-birth abortion. Dr. Romer is a practicing obstetrician and gynecologist in Dayton, Ohio and is a diplomat of the American Board of Obstetrics and Gynecology. She is a fellow of the American College of Obstetrics and Gynecology as well as a clinical professor in the Department of Obstetrics and Gynecology at Wright State University and vice chairman of the Department of Obstetrics and Gynecology of Miami Volley Hospital in Dayton.
Dr. Romer testified that "In my medical judgment this procedure [D X or partial-birth abortion] offers no advantage in safety nor efficacy over other methods of termination. . . [I]n my medical judgment, legislation to prohibit the D X procedure or partial birth abortion does not present a substantial barrier to women seeking late term abortion. There is no medical evidence that this procedure is safer nor necessary to provide comprehensive health care to women. As currently practiced, it does not meet medical standards set by ACOG nor has it been adequately proven to be safe or efficacious." Hearings on H.R. 1833 Before the Senate Judiciary, 104th Cong., 1st Sess. (Nov. 17, 1995) Transcript at p. 112.
We also note that a recent article in the WashingtonTimes quotes Dr. Frank Boehm, Director of Obstetrics at Vanderbilt University Medical Center in Nashville, as saying there are "no medical circumstances in which a partial-birth abortion is the only safe alternative." Dr. Frank Boehm, Partial-Birth Abortion Stirs A Medical Debate, Wash. Times, May 6, 1996. Thus, notwithstanding the decision of one judge in Ohio, it appears that substantial evidence could be presented that "safe" alternatives exist to partial-birth abortion.
III. Conclusion
It is essential to keep in mind that the D X or "partial-birth" abortion ban being challenged in Women'sMedical is a specific Ohio statute that may be subject to challenges not applicable to a Nebraska statute with different provisions. The Ohio statute apparently covers all abortions involving "inserting a suction device into the skull of a fetus to remove the brain." This fact seemed to play heavily in the decision of the federal district court. In contrast, the partial-birth abortion ban passed by the United States Congress (HR 1833) (and vetoed by President Clinton) banned only abortions in which a living fetus is partially delivered and then killed before delivery is completed.
Thus, it appears that while Ohio has attempted to ban all abortions which involve purposely sucking the brains out of unborn babies, the U.S. Congress attempted only to ban such abortions where the baby is still alive at the time the skull is pierced and the suction tube is inserted in the brain. Many or all of the objections of the District Court in theWomen's Medical case (whether valid or not) would seem to disappear in the context of the Congressional approach. This conclusion, however, brings to mind the comment of the District Court of Ohio that cutting the arms and legs off a "fetus" inside the mother and crushing its head with forceps (as is done routinely in abortion clinics after 12 weeks in D E abortions) is arguably no less cruel than sucking a baby's brains out after it is partially delivered.
Degree of cruelty is not the issue here, however. The legal issue presented is whether partial-birth abortions can constitutionally be banned. The answer is clearly yes, provided the statute does not impose an "undue burden" on women seeking abortions before viability of the fetus. A more specific, and less circular answer, is that it is inconceivable to us that a statute requiring the abortionist to kill the babybefore its brains are sucked out would place any "undue burden" on women that even the U.S. Supreme Court could identify. A statute which bans all suctioning of brains, however, would be more difficult to uphold given the current state of the law, since it could possibly encompass some D E abortions if they are not specifically excluded in the statute. However, if evidence shows that suctioning of the brains of living fetuses is never medically necessary, it could be banned outright. The federal district court's decision in southern Ohio has no legal force in Nebraska.
Finally, we would be remiss if we did not state the obvious: The legal question presented by the examination of the constitutionality of partial-birth abortion legislation is so inherently macabre, and utterly divorced from moral or rational foundation that it undermines the credibility of the legal system, and necessarily exposes the moral bankruptcy which is the legacy of Roe v. Wade. As the federal district court in Women's Medical recently stated, "Never, since the final shot of the Civil War, over a century and a quarter ago, has American society been faced with an issue so polarizing and, so totally incapable of . . . compromise, as is the ongoing controversy, of which this case is but the latest chapter, over the legality of attempts by the State to regulate abortion — the act of voluntarily terminating a pregnancy, prior to full term." Women's Medical,911 F. Supp. at 1056.
Under the current state of Nebraska law, human fetuses or unborn babies are literally afforded less legal protection against cruelty, including dismemberment and death, than stray cats or rodents. It would be a criminal offense under Nebraska law to cut off the limbs of a cat or suck the brains out of a living rat merely to kill it, as is done in partial-birth abortions. See Neb. Rev. Stat. § 28-1008, 1009 (1994 Supp.). In contrast, unborn babies, who at 19 weeks can be felt kicking through their mother's body (externally) and who can be seen sucking their thumbs on ultrasound, can legally have their limbs cut off and their skulls crushed with forceps in D 
E abortions (which are not the subject of partial-birth abortion legislation) or have their brains sucked out during what would otherwise constitute delivery by a D X or partial-birth abortion. See Women's Medical, 911 F. Supp. at 1065
(discussing testimony of Dr. Harlan Giles, who performs D E abortions up to the 20th week of pregnancy). This is the legal and medical reality of Roe v. Wade and PlannedParenthood v. Casey.
In sum, we believe that a partial-birth abortion statute could be drafted that would meet constitutional requirements under applicable decisions of the United States Supreme Court. We note that if the goal of such legislation is to prevent cruelty to late-term fetuses (as was the intent in Ohio), then amendments should also be made to Nebraska's existing statute regulating post-viability abortions (as was done by the Ohio Legislature) since the existing statute may permit other equally cruel abortion procedures to be performed on viable unborn babies. Any statutory changes must, of course, be carefully structured to meet the criteria of Planned Parenthood v.Casey, and should be accompanied by specific statements of legislative intent.
Sincerely yours,
 DON STENBERG Attorney General
 Steve Grasz Deputy Attorney General
APPROVED BY:
Don Stenberg
Attorney General
[1] Some legal scholars have argued that a less stringent test should be applied by reviewing courts due to the distinguishable features of a partial-birth abortion ban as compared to other abortion restrictions considered by the U.S. Supreme Court.See Hearings on HR 1833 Before the Senate Judiciary Committee, 104th Cong., 1st Sess. (Nov. 17, 1995) (testimony of David M. Smolin, Prof. of Law, Cumberland Law School, Samford University) transcript at pp. 344-350; Hearings on HR 1833 Before the Senate Judiciary Committee, 104th Cong., 1st Sess. (Nov. 17, 1995) (testimony of Douglas W. Kmiec, Prof. of Constitutional Law, University of Notre Dame), transcript at pp. 172-187 These arguments appear to have merit, and would likely be pursued in any litigation arising as a result of adoption of legislation banning partial-birth abortions. However, for purposes of this opinion, we will proceed under the most restrictive possible constitutional test.
[2] This opinion expresses no view as to the proper judicial standard for adjudicating a "facial" challenge to the constitutionality of an abortion statute, as opposed to a challenge to a statute "as applied". Since Casey, a split has developed among the circuit courts as to whether the approach taken in Casey has replaced the standard inUnited States v. Salerno, 481 U.S. 739 (1987). The Eighth Circuit has concluded that Casey did replaceSalerno. See Planned Parenthood, Sioux FallsClinic v. Miller, 63 F.3d 1452, 1458 (8th Circuit 1995). However, in separate (and unusual) memoranda accompanying an order denying a writ of certiorari in this same South Dakota case, two Justices of the Supreme Court took differing views of this issue. Justice Scalia stated that this question "virtually cries out for our review." Janklow v. PlannedParenthood, 1996 WL 203346 (U.S.) (Scalia, J., dissenting) (April 29, 1996). It is possible, therefore, this issue will eventually be taken up by the Court in Women's MedicalProfessional Corp. v. Voinovich, 911 F. Supp. 1051
(S.D. Ohio 1995) (currently on appeal to the 6th Circuit), in which this issue was also litigated.
[3] Allegedly, some abortionists kill the baby by other means before the brain is removed. For example, one doctor says he cuts the baby's umbilical cord, and the baby dies before the procedure is performed. It reportedly "takes eight to ten minutes for the fetus to die, following the cutting of the umbilical cord." Women's Medical, 911 F. Supp. at 1066
n. 17. However, the same doctor told the American Medical News that two-thirds of the fetuses are alive when he performs the procedure. See Hearings on H.R. 1833 Before the Senate Judiciary Committee, 104th Cong., 1st Sess. Transcript at p. 23.
[4] We note that recent media reports in Nebraska concerning this procedure have not always described partial-birth abortions accurately. Several articles have stated that "the physician uses an instrument to pierce and drain the skull." The skull is not "drained". Rather, the brains are suctioned out. Use of the word "drained" is a factually inaccurate euphemism. The scientific reality is that the fetus or unborn child's brains are sucked out during what would otherwise constitute delivery.